[No. B183616. Second Dist., Div. Two. Dec. 21, 2006.]

THE PEOPLE, Plaintiff and Respondent, v.
KENNETH RASMUSON, Defendant and Appellant.

1490

---

**COUNSEL**

Jean F. Matulis, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Mary Jo Graves, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Chung L. Mar and Beverly K. Falk, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**CHAVEZ, J.**—Kenneth Rasmuson, incarcerated at Atascadero State Hospital (Atascadero) as a sexually violent predator (SVP) under the Sexually Violent Predator Act (SVPA) (Welf. & Inst. Code, § 6600 et seq.),[1] appeals from an order denying his petition for conditional release made pursuant to section 6608. The trial court denied the petition, finding that appellant failed to meet his burden of proving that it was unlikely he would engage in sexually violent criminal behavior upon his release. Appellant contends that (1) the order must be reversed because due process requires that the government shoulder the burden of justifying continued custodial confinement once inpatient treatment has been completed, and (2) the trial court abused its discretion in denying his petition.

We reverse.

## FACTUAL AND PROCEDURAL BACKGROUND

In 1981, at age 19, appellant was convicted of forced oral copulation, sodomy and a lewd act on an 11-year-old boy. He was incarcerated until 1985, when he was released into a conditional release program. In 1987, he reoffended, committing heinous sex acts on a three-year-old boy, then abandoning the child at an isolated location in the mountains. Appellant admitted to molesting numerous additional victims.

On December 14, 2004, at the age of 43, appellant filed a request for conditional release from Atascadero pursuant to section 6608. David K. Fennell, M.D., Acting Medical Director of Atascadero, wrote the trial court a letter, dated February 16, 2005, stating that, "*It is my opinion, to a degree of medical certainty, that Mr. Kenneth Rasmuson's condition has so changed that he would not be a danger to others in that it is not likely that he will engage in sexually violent criminal behavior if placed under supervision and treatment in the community.*" (Original italics.) The letter went on to say that, "[T]he treatment staff and I do not believe that Mr. Rasmuson is 'cured' of his pedophilia. The essence of the recommendation is that because of the changes in his condition, Mr. Rasmuson is suitable for a strictly supervised outpatient program. The patient's pedophilia is a life-long condition which will require supervised outpatient treatment indefinitely."

The trial court conducted a plenary evidentiary hearing at which the following evidence was adduced.

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

*Appellant's Witnesses*

*Mary Flavan, M.D.*

Mary Flavan, M.D., is a staff psychiatrist at Atascadero and was appellant's treating psychiatrist for several years, until a year and one-half prior to the section 6608 hearing. She described appellant as a "very serious pedophile," with a lifelong condition. When she took over appellant's treatment, he was conscientiously pursuing relapse prevention. She found his efforts to be helping, at least in the hospital.

Dr. Flavan informed appellant of the additional treatment option of taking antiandrogen medication (Lupron), which lowers testosterone and reduces most, if not all, of a person's sex drive, thereby significantly reducing the recidivism rate of serious sex offenders. In Dr. Flavan's opinion, supported by numerous studies, 99 percent of patients using antiandrogens do well because they interrupt the obsessive quality of the sex drive, reduce fantasies, and eliminate most dreams. Appellant agreed to take Lupron to reduce his testosterone to a castration level.

According to Dr. Flavan, three and one-half weeks after starting Lupron, appellant reported that he had "never been more free in my life." Several weeks later, he stated that, "You know, I thought there would be this gaping hole in my soul when I tried this medicine. I am now able to do anything in life I want. I did not know what was wrong." Dr. Flavan and two evaluators agreed that there was a dramatic change in appellant's personality, as if a huge load had been lifted from him.

Dr. Flavan opined that because of his "full personality," family support, determination to work with his caregivers, and intellectual and hobby interests, appellant was a good candidate for conditional release and would not be a danger if monitored and continued taking antiandrogens, the ingestion of which could be insured by use of a once-a-year implant, among other means. Although appellant reoffended when released in the 1980's, Dr. Flavan noted that he was not then honest about his drug use.

*Dale Arnold, Ph.D.*

Dale Arnold, Ph.D., was a ward psychologist at Atascadero from 1997 to 1999, during which time he cofacilitated a social skills group in which appellant participated. In Dr. Arnold's opinion, although appellant would always be a pedophile, if released into a conditional release program, he

would be unlikely to reoffend, even without using antiandrogens.[2] Dr. Arnold based his opinion on appellant's recognition of the risk factors he had to avoid, his completion of the four phases of treatment at Atascadero, his reduced sexual intensity due to medication, and high motivation not to reoffend.

Dr. Arnold rendered his opinion despite acknowledging that appellant faced a lifelong risk of reoffending. Indeed, he had received a score of seven on the Static-99 Risk Assessment Instrument, which placed him in the high-risk category for sexual reoffense. His age would not be likely to diminish risk until he reached approximately 60 years old. Appellant's risk factors include: the fact that he never had an intimate relationship with an adult and is a male-object pedophile; that he had a problem with substance abuse that may reoccur despite his dedication to abstinence; and that he possessed dynamic risk factors, including impulsivity, intimacy deficiency and the need to act out in a sexual deviant manner when under stress, which would likely increase upon release. Dr. Arnold acknowledged there was little statistical data on the success rate of the Atascadero treatment program.

Dr. Arnold explained that appellant's reoffending within a year after his previous release was not predictive of the likelihood of his reoffending again (even though he was then, like now, a "star patient," whose sexual attraction to children had been reduced from 90 percent to 10 percent), as the earlier treatment program was "covert sensitization," which was then viewed as a "fix" although it did not cure anyone and was substantially different from his current treatment. The release program then had less intensive supervision than the current program. That program also failed to address appellant's use of cocaine, did not use antiandrogen therapy, and program supervisors failed to act when they suspected appellant was using drugs.

*Beryl Davis, Ph.D.*

Beryl Davis, Ph.D., is a psychologist on the Department of Mental Health (DMH) expert panel determining who is an SVP. She reviewed appellant's records and interviewed him and his parents.

Dr. Davis opined, without any doubt, that appellant was suitable for conditional release, although he would never be cured of his condition. She based her opinion on a number of factors, including that appellant entered therapy at Atascadero despite substantial peer pressure to do otherwise; that appellant was able to express what he needed to do to avoid reoffense; that he

---

[2] Dr. Arnold believed, however, that if appellant stopped using antiandrogens, he would require the use of other safeguards.

worked diligently on his treatment including antiandrogen therapy; that since taking antiandrogens his polygraph and penile plethysmograph (PPG) tests showed that he no longer had sexual fantasies; that appellant was an "ego-dystonic pedophile," meaning that he disliked that part of himself,[3] and finally that the "cognitive behavioral therapy" given at Atascadero has shown some improvement over prior forms of treatment in reducing recidivism.

Dr. Davis had concluded three years earlier, in contradiction to the Atascadero treatment team, that appellant was not an SVP and could then be safely released with appropriate voluntary treatment and antiandrogens. Her opinion relied to a large extent upon the effectiveness of antiandrogens, although appellant had only then been on the medication for one month.

*Jack Vognsen, Ph.D.*

Jack Vognsen, Ph.D., was a psychologist hired by the DMH to evaluate appellant. After spending almost three hours with him, Dr. Vognsen found appellant to be forthright, honest, and committed to not reoffending and to living a sober and sex-offense-free life.

However, Dr. Vognsen also noted factors, which increased appellant's risk upon conditional release. These included that appellant was skilled at manipulating interviewers, having done so in the past, and might try to do so in the conditional release program (CONREP); he had little work experience, which would likely affect his ability to be self-supporting upon release; he had molested a six-year-old boy when he was 15 years old, with early offending being a sign of "highly deviant sexuality"; he had admitted to Dr. Vognsen committing offenses against other victims, in addition to the offense of which he was convicted in April 1985, and being involved in at least 10 molestations since age 18; and, that activities at Atascadero, suggesting that he felt good about himself, did not indicate much about his ability to refrain from reoffending if he again found himself in a difficult situation, particularly since his early offenses occurred while he was experiencing trauma. Dr. Vognsen was very concerned that if appellant reoffended, he would do so more egregiously than before.

Despite these risks, Dr. Vognsen opined that, with some qualifications, appellant was suitable for conditional release, and with tight control and close supervision his risk of reoffending was low. Appellant had to have the approval of his Atascadero team, whose reports consistently indicated appellant's heavy involvement in his program, and be on a conditional release program that included group treatment three times per week, individual

---

[3] This is in stark contrast to some pedophiles who believe that sex with children is "fine."

treatment as needed, ongoing polygraph and PPG testing and constant drug testing. He concluded that appellant had reduced his sexually deviant urges significantly by behavioral means, and could succeed without antiandrogens. Though appellant continued to experience sexually deviant thoughts, and would always do so even in CONREP with therapy and antiandrogens, Dr. Vognsen maintained that the issue was whether he would act on those thoughts, not whether he would have them.

*Harry Goldberg, Ph.D.*

Harry Goldberg, Ph.D., a clinical psychologist in private practice working with sex offenders in CONREP and conducting SVP mental health evaluations for the courts, was hired by DMH to evaluate appellant. He reviewed appellant's records and interviewed him for three hours.

Dr. Goldberg characterized appellant as a high-risk sex offender because of his history and scores on the Static-99 test, assessing static conditions, and the MnSOST-R (Minnesota Sex Offender Screening Tool-Revised) test, based in part on dynamic factors.[4] Appellant evidenced numerous aggravating factors, including early onset of sexual deviancy, lack of an intimate relationship with another adult, serious intimacy deficit, lack of concern for others, and precipitation of sexual misconduct by stress situations and impulsivity. Appellant's past failure to cooperate was a prior aggravating factor, although it was no longer the case.

On the positive side, Dr. Goldberg noted that appellant was an exemplary patient. He had strong family support and had become increasingly forthright, having admitted to unadjudicated offenses and to past experimentation with drugs. Dr. Goldberg found appellant comparable to another person who had been successfully released into CONREP.

Dr. Goldberg opined that although appellant was a high-risk SVP based on his history, CONREP would nonetheless be a good, safe and effective means of releasing him, though not a guaranty against reoffending. It provided 24-hour per day Global Position System (GPS) monitoring, random home visits, searches, polygraphs, PPG's, blood and urine monitoring, travel restrictions, and intensive supervision. It would not permit appellant to reside near locations where children frequent, and would screen his relationships. Appellant would be unable to associate with other sex offenders, unlike in his first release program, and his ability to view certain media and to drive would be restricted and monitored. He would also be involved in individual and

---

[4] Appellant's treatment reduced his MnSOST-R test score from a 72 percent to 57 percent chance of recidivism; a high-risk to a moderate-risk category.

group therapy and psychological assessments, would be required to keep a daily journal, and would have a curfew. He would have to remain on his medications. Dr. Goldberg believed that CONREP would uncover any deception by appellant before he reoffended. CONREP's recidivism rate is very low because it can return a person to the hospital at the first hint of a problem. Furthermore, appellant's current treatment was focused on relapse prevention and "cognitive behavioral treatment," which is "state of the art" and a vast improvement over appellant's earlier treatment.

Dr. Goldberg testified that the vast majority of the research indicates that antiandrogen treatment has a positive effect in reducing recidivism, though a patient can stop taking these medications. Appellant's self-report of improvement from antiandrogens was objectively verified by the PPG and polygraph tests, which indicated that his arousal to deviant stimuli had substantially diminished. While Dr. Goldberg indicated he would be concerned if appellant stopped taking antiandrogens, he found him suitable for conditional release even without them. Dr. Goldberg found Dr. Padilla's study questioning the effectiveness of antiandrogens to be flawed because it used a very small, nonrandom sample.[5] It was only an exploratory study that was never published and did not deal with the problem of sexual arousal and antiandrogens.

Ultimately, Dr. Goldberg concluded that while appellant's current treatment is not a guaranty against reoffending, CONREP makes the release safe.

*Michael Pritchard, Ph.D.*

Michael Pritchard, Ph.D., is a clinical psychologist who acted as a unit psychologist at Atascadero assigned to the SVP program. He described Atascadero's five-phase treatment program: phase I, "Treatment Readiness," educates patients as to how the hospital works, what the diagnoses are and what relapse treatment is; phase II, "Skills Acquisition," teaches patients principles of relapse prevention by going through the histories of their offenses to effect behavioral changes and empathy for their victims; phase III, "Skills Application," continues for years and teaches participants to identify their thinking errors and high-risk behaviors; phase IV, "Skills Transition," aligns participants with outpatient placement and makes them aware of all of the terms of such placement; and phase V, "Placement in the Community," places participants in a conditional release program. Only three individuals at Atascadero had reached phase V.

---

[5] Dr. Jesus Padilla is a senior psychologist specialist at Atascadero who was involved in a literature review and study of the effects of antiandrogen use on the ability to achieve erection. (See p. 1500, *post.*)

Dr. Pritchard worked with appellant at Atascadero for seven years and observed that he had accomplished all that the program required. He was aware of and identified all of his high-risk behaviors and demonstrated the ability to cope with his risks in life situations. He was able to recognize his cognitive distortions and manage sexual arousal. He demonstrated the ability to have empathy for others and follow program rules. Appellant also worked on his tendency to minimize his future potential risk of reoffending and of substance abuse and his making himself look better than he was. Appellant was given the highest level of access at the hospital, being able to move relatively freely throughout the hospital all day without having to check back in the unit. Only six of 600 patients at Atascadero had been given that privilege.

When appellant began taking Lupron, his testosterone level was lowered. He looked better physically, was more active and seemed less downtrodden. He reported improvement from the medication, which was confirmed by PPG and polygraph tests. In December 2004, appellant's treatment team concluded that he should be recommended for conditional release. While acknowledging that pedophilia is chronic and does not go away, Dr. Pritchard believed, without any reservations, that appellant was not likely to commit a sexually violent crime if released under the proposed conditions, although he should have lifelong monitoring.

Dr. Pritchard did not believe that appellant's failure in his previous release, more than 15 years earlier, precluded his current release. In the previous release, appellant was at higher risk because he was using drugs and living with a sex offender and at least one minor child. He was also overextended, working and going to school. Further, CONREP is now better able to monitor him. It will subject him to a monitoring system which can be programmed to set up danger zones to alert appellant's supervisor if he approaches an off-limit area. He will have a curfew; his blood will be monitored; he will be given Lupron, paid for by DMH; his days will be regimented and completely planned; his activities, telephone calls, housing, social interactions and employment will be monitored; and he will be required to maintain a detailed journal of all of his activities, which will be compared each day to the GPS record of his whereabouts. CONREP provides a "region coordinator" assigned to appellant, who will virtually have a one-to-one relationship with him. Appellant will remain in the CONREP program until there is a consensus that he is no longer an SVP, which could be indefinitely.

*Amy Phenix, Ph.D.*

Amy Phenix, Ph.D., an experienced licensed clinical psychologist who wrote the clinical evaluation protocol for SVP's, worked for CONREP and

evaluated appellant to assess his suitability for conditional release. She interviewed him for three hours and reviewed his file. It was Dr. Phenix's opinion that appellant was suitable for conditional release, even if he discontinued taking antiandrogens, because he had the skills to manage his sexual deviancy. The optimum way to ensure that high-risk offenders do not reoffend is to provide strict supervision for a lengthy period and continued reinforcement of treatment. Dr. Phenix believed that CONREP was effective in providing such services. She found the risk of appellant returning to substance abuse to be low because of constant monitoring by CONREP, random drug testing, and random home visits. CONREP was much stricter now than in the 1980's.

Dr. Phenix believed appellant was a different person from when he committed his sex crimes. Although antiandrogens are not effective for everyone, she believed appellant was having reduced deviant sexual arousal and fantasies. His self-report of the benefits of Lupron, although not to be taken at face value, was likely to be true due to corroboration by PPG's and polygraphs. The treatment appellant received upon his release in the 1980's was ineffective in reducing the risk of reoffending. Current treatment includes cognitive behavioral treatment where the patient works to manage and control his deviancy. There is little data regarding the effectiveness of the therapy at Atascadero, and there is a minority view that it is not effective. Additional data on its effectiveness is still required.

*William Vicary, M.D.*

William Vicary, M.D., specializes in forensic psychiatry. After meeting appellant, reviewing his history and evaluating him for three reports, Dr. Vicary concluded that appellant would not be a danger if placed in CONREP, which he characterized as an almost "failsafe" program.[6] Appellant had been a model patient and one of the few to agree to treatment. The doctor believed that appellant's knowledge that if he "slip[s] up" he would be rehospitalized was a strong incentive for him to succeed. Additionally, the consensus of medical and scientific literature is that antiandrogens can be clinically useful in treating sex offenders, and appellant is one of the most dramatic examples of that benefit. His testosterone was at a minimal level, and PPG and polygraph testing documented his self-report that he had no further deviant sexual obsessions or arousal. After taking Lupron, there was a

---

[6] Dr. Vicary concluded that appellant qualifies as an SVP, with a risk of reoffending of 10 to 20 percent. If appellant returned to substance abuse, he would be a far greater risk. Several years earlier, Dr. Vicary had expressed the view that appellant was no longer an SVP. He explained that that was because the standard then was whether it was more likely than not that he would reoffend. The standard has since become more stringent, requiring that there be a substantial danger that he would reoffend.

striking change in appellant's behavior. He was below 30 on the PCL-R (Psychopathy Checklist-Revised) test which reflects a lower risk of future violent or sex offenses.

Dr. Vicary reached his conclusion despite finding it significant that appellant fooled supervisors during his prior conditional release program, reoffended with multiple child molestation victims while being supervised and receiving individual and group sex offender therapy, and can be extremely manipulative. Dr. Vicary noted that appellant was also a role model patient before his past release. He was also concerned that appellant minimized his responsibility and made conflicting statements. Both of appellant's criminal convictions had aggressive and sadistic elements, making it even more difficult to modify his behavior, even with counseling. Pedophiles who molest males are less likely to change over a long period of time. In sexual behavior laboratory, appellant had a high arousal to aggressive sexual behavior with children of both sexes. He was maximally aroused to children from age 10 to 13 years old. Appellant stated that he never achieved orgasm through use of an adult fantasy without the intrusion of a child fantasy. He also expressed sadness at the prospect of letting go of his arousal to young boys. These facts, in Dr. Vicary's opinion, cumulatively show a greater likelihood of reoffending even with CONREP monitoring. Also, appellant's substance abuse intensified his deviant sexual fantasies and aggressive impulses, making it critical that he stay away from substance abuse. Appellant was also a greater risk statistically because he first sexually offended when he was 15 years old and had numerous victims.

*Respondent's Witnesses*

*Jesus Padilla, Ph.D.*

Jesus Padilla, Ph.D., is a senior psychologist specialist at Atascadero. He performed annual SVP reports and recommitment evaluations for the court. Dr. Padilla was a member of the Atascadero design team and cochair of its Program Evaluation and Research Committee. His committee performed a "fairly lengthy" literature review of antiandrogen studies and conducted a study of their effects. After finding a disparity in the literature and methodological problems with the studies, the committee compared the PPG responses of individuals using antiandrogens with those who were not. It found no differences between the two groups' ability to achieve an erection. All 37 individuals in the study were able to achieve an erection, even with testosterone at the castration level. The committee concluded that it was premature to say that antiandrogens were either effective or ineffective.

Dr. Padilla conceded that he did not know how the subjects of his study compared to appellant in terms of weight, age, medical condition, family

background, or criminal history. He was also unaware of whether they were also receiving sex offender treatment, or how long they had been taking antiandrogens. Dr. Padilla, who had no advanced degree in medicine, biology or physiology, was the only professional at Atascadero who questioned the benefit of antiandrogens.

Though in April 2004 Dr. Padilla prepared an annual review report of appellant for the court, he had never treated appellant, and it was not his role to recommend whether appellant was ready for CONREP. Dr. Padilla found that appellant was participating well in treatment phase IV, though it was difficult to assess whether his self-report that Lupron suppressed his sexual urges and fantasies was true because he was known to fabricate or make inaccurate statements. Moreover, Dr. Padilla noted that once a person is released into the community, antiandrogens can be countered with testosterone or Viagra. Nevertheless, Dr. Padilla explicitly acknowledged that he had no opinion regarding appellant's suitability for conditional release.

*Kenneth Carabello*

Kenneth Carabello, a licensed social worker, was executive director of Liberty Healthcare, a private corporation that contracts with the DMH to provide the conditional release program for SVP's. He read reports about appellant, met appellant at meetings, and attended a February 2005 phase V staffing for appellant. Carabello had "concerns" regarding appellant's release, finding the case to be a "very close call for me." He had reservations about appellant's past failure in a conditional release program and a January 2005 minor incident with another inmate. He preferred to see a period of six to 12 months of stability after the incident before release, but conceded that he would not object to a court-ordered conditional release of appellant.

*Closing Argument*

In closing argument, the People emphasized that appellant should not be conditionally released because his prior offenses were aggressive, sadistic, and extremely serious; he had a serious drug and alcohol problem; his age of 43 did not reduce the likelihood of recidivism; he reoffended after his prior release at a time when he was also a "model patient"; and the conditional release program he received on his prior release was not significantly different from the current release program.

*The Trial Court's Ruling*

The trial court took the matter under submission, later issuing a terse minute order stating, "Petitioner Kenneth Rasmuson having failed to meet his

burden of proof, Petitioner's petition for conditional release pursuant to Welfare and Institutions Code section 6608 is denied."

## DISCUSSION

Appellant contends that the trial court abused its discretion by denying his petition for conditional release made pursuant to section 6608. He further contends that subdivision (i) of that section denies him due process by placing the burden on him to establish his entitlement to conditional release by a preponderance of the evidence, rather than placing the burden on the government to justify continued confinement. We conclude that regardless who must shoulder the burden, the trial court's ruling must be reversed.[7]

*The SVPA*

The SVPA, adding sections 6600 through 6608, became effective on January 1, 1996. It was adopted based on the Legislature's findings "that a small but extremely dangerous group of sexually violent predators that have diagnosable mental disorders can be identified while they are incarcerated. These persons are not safe to be at large and if released represent a danger to the health and safety of others in that they are likely to engage in acts of sexual violence. . . . It is the intent of the Legislature that once identified, these individuals, if found to be likely to commit acts of sexually violent criminal behavior beyond a reasonable doubt, be confined and treated until such time that it can be determined that they no longer present a threat to society." (See Historical and Statutory Notes, 73D West's Ann. Welf. & Inst. Code (1998 ed.) foll. § 6600, pp. 249–250.)

The Senate Committee on Criminal Procedure's analysis of Senate Bill No. 1143 states that the SVPA's purpose is to "[commit SVP's] to the custody of the State Department of Mental Health for appropriate treatment and confinement in a prison facility *until his or her mental abnormality or personality disorder has so changed that he or she is not likely to commit an act of sexual violence.*" (Sen. Com. on Criminal Procedure, Analysis of Sen. Bill No. 1143 (1995–1996 Reg. Sess.) Apr. 25, 1995, p. k, italics added.)

According to the Assembly Committee on Public Safety, the SVPA was needed because: "As a result of determinate sentencing, sex offenders are now automatically released from prison at the end of their terms. According to the California Department of Corrections, there are approximately 11,000 sex offenders currently in state prison. The law compels the release of about

---

[7] Given this conclusion, we need not decide the constitutionality of imposing the burden on appellant to establish entitlement to conditional release.

250 of these inmates a month, or 3,000 a year. Predatory child molesters, forcible rapists, and repeat violent sex offenders are among them. [¶] Under current law, there is no legal authority to detain and treat sexually violent offenders who, because of a mental abnormality or personality disorder, are likely to re-offend once released from prison. Likewise, there is no current way to prevent their release into society." (Assem. Com. on Public Safety, Analysis of Assem. Bill No. 888 (1995–1996 Reg. Sess.) as amended Apr. 17, 1995, p. 5.) It was to fill this gaping hole in the law and to prevent SVP's serving prison terms from being released into society upon completion of their term that the SVPA was adopted.

██ At the time of appellant's conditional release hearing, the SVPA provided: An "SVP" is "a person who has been convicted of a sexually violent offense against two or more victims and who has a diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior." (§ 6600, former subd. (a).) A "sexually violent offense" is one of the statutorily enumerated sex crimes "committed by force, violence, duress, menace, fear of immediate and unlawful bodily injury on the victim or another person . . . ." (§ 6600, subd. (b).) A "diagnosed mental disorder" includes "a congenital or acquired condition affecting the emotional or volitional capacity that predisposes the person to the commission of criminal sexual acts in a degree constituting the person a menace to the health and safety of others." (§ 6600, subd. (c).)

Sections 6600 through 6604 provided the procedure leading to and including adjudicating whether a prisoner is an SVP. The Department of Corrections first screens the prisoner. If the screening indicates that the prisoner is likely to be an SVP, the matter is referred to the DMH. (§ 6601, subd. (b).) The DMH has two psychiatrists and/or psychologists evaluate the prisoner. If both agree that the prisoner is an SVP, the DMH refers the matter to the county's designated attorney for the filing of a petition for commitment. (§ 6601, subds. (c) & (d).) If counsel concurs in the DMH conclusion, a petition for commitment is filed. (§ 6601, subds. (h) & (i).) A trial court reviews the petition and conducts a probable cause hearing to "determine whether . . . the individual named . . . is likely to engage in sexually violent predatory criminal behavior upon his or her release." (§ 6602, subd. (a).) If probable cause is found (§ 6602, subd. (a)), a trial at which "[t]he court or jury shall determine whether, beyond a reasonable doubt, the person is a sexually violent predator," is conducted. (§ 6604.) If found at trial to be an

SVP, the prisoner must be committed to the custody of the DMH for treatment and confinement for a period of two years.[8] (§ 6604.)

■ This appeal involves a proceeding for conditional release under section 6608 of the SVPA. Because the SVPA is designed to ensure that a committed person does not remain confined any longer than he or she qualifies as an SVP, it provides means for that individual to obtain review of his or her mental condition to determine if civil confinement remains necessary. (*People v. Cheek* (2001) 25 Cal.4th 894, 898 [108 Cal.Rptr.2d 181, 24 P.3d 1204].) The committed SVP can petition the court for conditional release but no hearing shall occur until after one year of commitment. (§ 6608, subds. (a) & (c).) Before acting on such a petition, the trial court must first obtain the written recommendation of the director of the treatment facility to which the person is committed. (§ 6608, subd. (j).) It reviews the petition in order to "determine if it is based upon frivolous grounds," and if it so finds, it denies the petition without a hearing. (§ 6608, subd. (a).) ■ If it does not so find, section 6608, subdivision (d) provides that, "The court shall hold a hearing to determine *whether the person committed would be a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior due to his or her diagnosed mental disorder if under supervision and treatment in the community.* If the court . . . determines that the committed person would not be a danger to others due to his or her diagnosed mental disorder while under supervision and treatment in the community, the court shall order the committed person placed with an appropriate forensic conditional release program operated by the state for one year. . . . At the end of one year, the court shall hold a hearing to determine if the person should be unconditionally released from commitment on the basis that, by reason of a diagnosed mental disorder, he or she is not a danger to the health and safety of others in that it is not likely that he or she will engage in sexually violent criminal behavior." (Italics added.) At the hearing, the petitioner has the burden of proof by a preponderance of the evidence. (§ 6608, subd. (i).)

*The Standard of Review*

Before considering the merits of appellant's appeal, we must first determine the appropriate standard of review. We have found and been referred to no California appellate decision answering this question with regard to a section 6608 petition. Appellant assumes without discussion that we review the trial court's ruling for abuse of discretion and reverse only if there is a clear abuse of discretion and a miscarriage of justice. (*Blank v. Kirwan* (1985)

---

[8] In September 2006, as emergency legislation, the Legislature amended section 6604 to provide for an indeterminate term of commitment, adding other provisions to the SVPA to insure regular review of the SVP's continued status as such. (Stats. 2006, ch. 337, § 55.)

39 Cal.3d 311, 331 [216 Cal.Rptr. 718, 703 P.2d 58].) Respondent suggests that the appropriate standard may be the substantial evidence standard by which we review the trial court ruling "to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331 [75 Cal.Rptr.2d 412, 956 P.2d 374].)

We conclude that the substantial evidence standard is appropriate here. It is used in reviewing any disputed factual question, whether it arises at trial or otherwise, and whether the trial court's findings are express or implied. (See *SFPP v. Burlington Northern & Santa Fe Ry. Co.* (2004) 121 Cal.App.4th 452, 462 [17 Cal.Rptr.3d 96]; *Winograd v. American Broadcasting Co.* (1998) 68 Cal.App.4th 624, 632 [80 Cal.Rptr.2d 378]; see also *People v. Singer* (1990) 226 Cal.App.3d 23, 32 [275 Cal.Rptr. 911].) A section 6608 petition for conditional release requires the trial court to make a factual determination, ordinarily reviewed for sufficiency of the evidence, of whether "it is likely that [the person committed] will engage in sexually violent criminal behavior due to his or her diagnosed mental disorder if under supervision and treatment in the community." (§ 6608, subd. (d).) If it is determined that reoffense is unlikely, section 6608, subdivision (d) provides that "the court *shall* order the committed person placed with an appropriate forensic conditional release program operated by the state for one year." (Italics added.) The statute's use of the term "shall" signifies that the trial court has no discretion but must order conditional release when the required factual showing is made.[9] In addition, commitment under the SVPA is a civil commitment procedure, which by recent amendments commits a defendant indefinitely,[10] after he has already paid his debt to society by serving out his prison term. This circumstance warrants closer appellate review than permitted by the abuse of discretion standard.

In support of appellant's assertion that the abuse of discretion standard is applicable, he cites no case dealing with review of a section 6608 ruling. The

---

[9] Noting that neither section 6602 nor its legislative history provides any guidance on the applicable standard of review of a ruling at a section 6602 probable cause hearing, the California Supreme Court determined in *Cooley v. Superior Court* (2002) 29 Cal.4th 228 [127 Cal.Rptr.2d 177, 57 P.3d 654] (*Cooley*) that that context presents a mixed question of law and fact analogous to that presented at a criminal preliminary hearing where the legal determination of probable cause must be made from factual findings. (*Id.* at p. 257.) The findings of fact, if the trial court avails itself of its power to render such findings, are reviewed for substantial evidence and, if not, the review is independent, appropriate for questions of law.

We do not find *Cooley*'s analysis applicable here. The trial court is not called upon at a conditional release hearing under section 6608 to make a legal determination of probable cause. Rather, it must decide the disputed factual question of whether the appellant is likely to reoffend if released.

[10] See footnote 8, *ante.*

cases he cites are distinguishable. *People v. Henderson* (1986) 187 Cal.App.3d 1263, 1267–1268 [233 Cal.Rptr. 141] applied the abuse of discretion standard when a mentally disordered sex offender sought outpatient status under Penal Code section 1603. Subdivision (a) of that section states that a person "may" be placed on outpatient status if certain conditions are met, including that the person no longer presents a danger to others or to himself. This permissive language gives the trial court discretion to grant the petition if the conditions are met and distinguishes Penal Code section 1603 from the mandatory language of section 6608.

In *People v. Michael W.* (1995) 32 Cal.App.4th 1111 [38 Cal.Rptr.2d 556] (*Michael W.*), the Court of Appeal applied the abuse of discretion standard of review to a trial court ruling on a petition for a ground pass, made by a defendant committed when found not guilty of robbery by reason of insanity. The Court of Appeal found that a petition for a ground pass is a request to alter the conditions of confinement under Penal Code section 1026. (*Michael W.*, at p. 1116.) Penal Code section 1026, in contrast to section 6608, provides that a defendant "shall not be released . . . unless and until the court . . . find[s] and determine[s] that the person's sanity has been restored." (Pen. Code, § 1026, subd. (b).) It does not mandate release upon a finding of restored sanity, but mandates continued confinement absent such a finding. Further, Penal Code section 1026, unlike section 6608, expressly directs the trial court to use the same procedures in determining whether to release a defendant found guilty by reason of insanity as used in probation revocation hearings, which traditionally utilize the abuse of discretion standard of review. (Pen. Code, § 1026, subd. (c); *Michael W., supra*, at p. 1119.)

In *People v. Sword* (1994) 29 Cal.App.4th 614, 624–625 [34 Cal.Rptr.2d 810], the defendant sought outpatient status under Penal Code section 1600 et seq. The Court of Appeal applied the abuse of discretion review without analysis or discussion. As previously stated, Penal Code section 1600 et seq. is not analogous to section 6800.

*"Likely" to Reoffend*

In *Foucha v. Louisiana* (1992) 504 U.S. 71 [118 L.Ed.2d 437, 112 S.Ct. 1780], the United States Supreme Court held that to commit a person to a mental institution in a civil proceeding, the state must prove by clear and convincing evidence that the person suffers from a mental illness and hospitalization is required for his own welfare and protection of others. (*Id.* at pp. 75–76.) When the person has recovered his sanity *or* is no longer dangerous, he must be released. (*Id.* at p. 77.) Section 6608, subdivision (a) of the SVPA satisfies, in part, this constitutional mandate by allowing an SVP to petition for conditional release upon a showing that he or she is not likely

to engage in sexually violent criminal behavior if released under supervision and treatment. (§ 6608, subd. (d).)

■ In a trilogy of cases, our Supreme Court has provided guidance as to the meaning of "likely" to reoffend in various sections of the SVPA. In *People v. Superior Court (Ghilotti)* (2002) 27 Cal.4th 888 [119 Cal.Rptr.2d 1, 44 P.3d 949] (*Ghilotti*), it considered the meaning of "likely" in section 6601, subdivision (d), in the phrase, "likely to engage in acts of sexual violence without appropriate treatment and custody," the issue upon which evaluators are to opine as a precondition to the filing of a petition to commit or recommit an SVP. The court reasoned that the word "likely" has no consistent meaning but may be used flexibly to cover a range of expectability from possible to probable (at pp. 916–917), and therefore, its precise meaning must be determined by consideration of the context. (*Id.* at pp. 917–918.) The word "likely," "when used in this context, must be given a meaning consistent with the statute's clear overall purpose . . . to protect the public from that limited group of persons who were previously convicted and imprisoned for violent sex offenses, and whose terms of incarceration have ended, [and] whose current mental disorders so impair their ability to control their violent sexual impulses that they *do in fact* present a high risk of reoffense if they are not treated in a confined setting." (*Id.* at p. 921.) The danger to society posed by sex offenders does not "evaporate with an expert's prediction that the sufferer's risk of reoffense is *no greater than 50 percent.* 'Danger' is merely 'the state of being exposed to harm.' " (*Id.* at p. 920.) The court therefore concluded that "*likely* to engage in acts of sexual violence . . . as used in section 6601, subdivision (d), connotes much more than the mere *possibility* that the person will reoffend . . . [but] does not require a precise determination that the chance of reoffense is *better than even.* [It means that] the person presents a *substantial danger*, that is, a *serious and well-founded risk*, that he or she will commit such crimes if free in the community." (*Ghilotti*, at p. 922.)

■ Six months after *Ghilotti*, in *Cooley, supra*, 29 Cal.4th 228, the California Supreme Court considered the meaning of "likely" in the phrase "likely to engage in sexually violent predatory criminal behavior upon . . . release," which is the required determination at the probable cause hearing pursuant to section 6602. The court applied the *Ghilotti* definition of "likely" stating, "We find no support in the statutory scheme or the legislative history for the notion that the Legislature intended a different definition of 'likely' to apply at the probable cause determination. '[A] word or phrase will be given the same meaning each time it appears in a statute . . . .' [Citations.]" (*Cooley, supra*, at p. 255.)

In *People v. Roberge* (2003) 29 Cal.4th 979 [129 Cal.Rptr.2d 861, 62 P.3d 97] (*Roberge*), the California Supreme Court was again called upon to

determine the meaning of "likely" as used in section 6600, subdivision (a), in the phrase, "likely [to] engage in sexually violent criminal behavior," which is the required determination at the trial to determine if a person is to be involuntarily committed as an SVP. (29 Cal.4th at p. 985.) The Supreme Court again applied the *Ghilotti* definition of "likely." (*Id.* at p. 986.)

Here, we are called upon to determine the meaning of "likely," in section 6608, subdivision (d) of the SVPA, in the phrase, "likely that he or she will engage in sexually violent criminal behavior due to his or her diagnosed mental disorder if under supervision and treatment in the community." This is the issue that must be decided at an SVP's conditional release hearing. We see no reason why "likely" in this context should be interpreted differently than in section 6601, subdivision (d) (*Ghilotti*), section 6602 (*Cooley*), or section 6600, subdivision (a) (*Roberge*). As the Supreme Court stated in *Cooley*, a word or phrase will be given the same meaning each time it is used in a statute. Had the Legislature intended a different standard to apply to a petition for conditional release, it certainly would have used different language.

Additionally, it would make no sense to allow an SVP to obtain conditional release by a different standard of evaluating the likelihood of reoffending than that used to commit him. If a less stringent standard (one that makes it easier to be released) is used for conditional release, the SVP could be released under circumstances for which he would still pose a substantial danger of reoffense and for which he could be recommitted. If a more stringent standard (one that makes it harder to be released) for conditional release is used, once committed, an SVP would remain committed though the risk of reoffending was insufficient to have had him committed in the first place.

*Sufficiency of the Evidence*

In denying appellant's petition for conditional release, the trial court found that he "failed to meet his burden of proof," that is, to establish by a preponderance of the evidence that he is not likely to reoffend. This finding is unsupported by the evidence.

"In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.]" (*People v. Bolin, supra,* 18 Cal.4th at p. 331.) We resolve all conflicts in the evidence and questions of credibility in favor of the verdict, and indulge every reasonable inference the jury could draw from the evidence. (*People v. Autry* (1995) 37 Cal.App.4th 351, 358 [43 Cal.Rptr.2d

135].) The testimony of one witness, if believed, may be sufficient to prove any fact. (Evid. Code, § 411.)

In support of his petition, appellant presented the testimony of eight mental health professionals, including three staff personnel from Atascadero where he was incarcerated and received treatment, a psychologist on the DMH expert panel that determines who is an SVP, two psychologists hired by the DMH to evaluate appellant, a forensic psychiatrist and one clinical psychologist who worked for Los Angeles CONREP and who wrote the clinical evaluation protocol for SVP's. All of these witnesses uniformly agreed that appellant would not be a significant danger to the community if conditionally released and did not present a "serious and well-founded risk" of reoffending. Dr. Vicary assessed the likelihood of reoffending at 10 to 20 percent, and Dr. Vognsen characterized his risk as "low." Each of the experts emphasized differing reasons for his or her conclusion including, among others, that appellant (1) was taking antiandrogens, which virtually eliminated his sexual arousal, dreams, and deviant sexual fantasies; (2) was one of only a handful of patients who had completed all phases of treatment at Atascadero despite significant peer pressure not to participate; (3) was a model patient; (4) worked hard on relapse prevention; (5) recognized his risk factors for reoffending; and (6) would be placed in the CONREP program, which, because of its omnipresent supervision and monitoring, was virtually "fail-safe," with a low recidivism rate. Half of appellant's experts testified that his conditional release was appropriate even if he was not taking antiandrogens.

Against this weighty and impressive evidence, the People failed to present a scintilla of evidence that appellant would likely reoffend. Dr. Padilla opined only that antiandrogens were of questionable benefit in reducing an SVP's sex drive, and there were questions about Dr. Padilla's expertise to conduct such a study and of its validity. In any event, taking antiandrogens was not the exclusive factor relied upon by any of the experts and not the lynchpin for the opinions of many of them, several concluding that appellant was not likely to reoffend even if he were not taking them. Dr. Padilla had little familiarity with appellant, never treated him, met with him for no more than 15 minutes, had no role in recommending whether he was ready for conditional release and expressly stated that he had no opinion on appellant's suitability for conditional release.

Carabello was a social worker and executive director of an SVP conditional release program. While he viewed the issue of the likelihood of appellant reoffending as a "very close call," and had reservations because of appellant's past unsuccessful release and appellant's minor confrontation with another inmate in January 2005, he stated that he would not object if

appellant was ordered released. He preferred, however, a six- to twelve-month delay (more than which has now passed) before the release. He did not opine that appellant was likely to reoffend upon release.

While the trial court was not required to follow the essentially unanimous and uncontradicted recommendations of appellant's eight expert witnesses (see *People v. Sword, supra*, 29 Cal.App.4th at p. 629), it could not arbitrarily disregard those recommendations. (*Ibid.*) But the trial court made no findings of fact or gave any indication as to why it chose not to accept the opinion of any of appellant's experts. It failed to indicate whether there were inaccuracies in the information on which they relied in reaching their conclusions. It is unlikely that the trial court would find each of the eight experts incredible or their opinions flawed by misinformation.

While the prosecution made much of the fact that appellant was convicted of heinous sexual offenses and reoffended within a short period of time after his last release as a "model patient," that occurred nearly two decades earlier, before appellant began using antiandrogens and went through the cognitive therapy treatment at Atascadero, which was different and more effective than the treatment he received before his earlier release. The present CONREP program provides far greater control, supervision and monitoring than did the prior release program. A person's history should not be determinative of whether he or she is a danger to reoffend. "The requisite likelihood of reoffense is . . . a separate determination which does not inevitably flow from one's history of violent sex offenses and a predisposing mental disorder." (*Ghilotti, supra*, 27 Cal.4th at pp. 920–921, fn. omitted.) That history is static and will never change. As substantial time has passed, its reliability as a predictor of a defendant's future behavior becomes more equivocal. If such static factors predominated in the assessment of whether an SVP should be given conditional release, a serious offender would never be released regardless of what events subsequent to his offenses revealed, which is contrary to the intent of SVPA, which allows conditional release even with some risk of reoffending.

In conclusion, there was no evidence supporting the trial court's implicit finding that appellant had failed to meet his burden of demonstrating that he was not likely to reoffend. Given the reports of the experts, to deny his petition was tantamount to concluding that no SVP who has ever committed a prior serious sexual offense, regardless of how long ago it occurred, can be conditionally released. Such a conclusion would present serious constitutional issues. (See *Foucha v. Louisiana, supra*, 504 U.S. at p. 77.)

## DISPOSITION

The order appealed from is reversed, and appellant's petition for conditional release is granted.

Boren, P. J., and Doi Todd, J., concurred.