Filed 11/4/13  P. v. Simmons CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H039198 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. E9909752) |
| v. | |
| MARK STEVEN SIMMONS, | |
| Defendant and Appellant. | |

Defendant Mark Steven Simmons appeals from an order extending his involuntary commitment as a mentally disordered offender (MDO), arguing that insufficient evidence supports the order.  We will affirm.

## FACTUAL AND PROCEDURAL HISTORY[1]

In early 1999, defendant, who was then 39 years old, boarded at a home where a 14-year-old girl, D., lived with her mother.  One day, defendant entered D.'s bedroom wearing only a bathrobe, held D.'s shoulders, and pressed himself against her back until she felt his penis.  Similar incidents occurred four or five times.  On a separate occasion,

---

[1] In his opening brief, defendant relies on the factual and procedural summary in *People v. Simmons* (Jan. 31, 2008, H031491) [nonpub. opn.], a prior unpublished opinion of this court regarding defendant.  We take judicial notice of that decision and our prior decision in *People v. Simmons* (Jun. 5, 2013, H037403) [nonpub. opn.].  (Evid.Code, § 452, subd. (d).)  We base our factual and procedural summary on those decisions, as well as the record in this case.

D. woke up and discovered that defendant was touching her legs, thighs, and the area between her legs.  D. pretended to be asleep, and defendant continued to touch her for 30 minutes or more.  D. tried to push defendant away, and he eventually stopped touching her.

In March 1999, defendant pleaded no contest to two counts of lewd and lascivious acts on a 14-year-old girl who was more than 10 years younger than him.  (Pen. Code, § 288, subd. (c)(1).)[2]  He was placed on probation in May 1999, on condition that he have no contact with D.  Probation was revoked in November 1999 because defendant violated that condition.  Defendant admitted the probation violation in December 1999, and he was committed to prison for a term of two years eight months.

In November 2000, defendant was transferred from prison to Atascadero State Hospital for treatment.  He was discharged to the Conditional Release Program (CONREP) in August 2001, but shortly thereafter he was re-hospitalized at Napa State Hospital (NSH) because he expressed suicidal ideations and failed to follow the CONREP rules.

In August 2003, the Santa Clara County District Attorney filed a petition, pursuant to the MDO Act (Pen. Code, § 2960 et seq.), to extend defendant's involuntary commitment beyond the expiration of his parole term.  A jury found that defendant was an MDO, and the trial court extended defendant's commitment for a one-year period. Between 2004 and 2011, the court periodically extended defendant's MDO commitment.

In April 2012, the Santa Clara County District Attorney filed a petition to extend defendant's MDO commitment for an additional year.  A court trial on the petition commenced on December 6, 2012.

---

[2]  Subsequent unspecified statutory references are to the Penal Code.

At the trial, Dr. Benjamin Philip Rose, a clinical staff psychologist at NSH, testified as an expert in the diagnosis of mental disorders and risk assessment. At the time of the trial, Dr. Rose had been treating defendant for approximately one year.

Dr. Rose opined that defendant suffered from the severe mental disorder of pedophilia. He explained that pedophilia is "an attraction to and behavior related to sexual contact with children under the age of 14 that persists for at least six months." In diagnosing defendant with pedophilia, Dr. Rose relied on records that showed the following: defendant placed his finger inside a four-year-old girl's vagina, defendant touched an eight-year-old girl between her legs, at the age of 16 defendant had sex with his 10-year-old sister, and defendant masturbated to images of his 10-year-old sister. Dr. Rose also opined that defendant suffered from narcissistic personality disorder, a condition that "has to do with attitudes and beliefs of grandiosity and a lack of empathy and a need for adoration."

Dr. Rose opined that defendant's pedophilia was not in remission through treatment. He explained that defendant failed to discuss his sexual misconduct with his treatment team, defendant would not discuss the triggers to his pedophilic impulses, defendant did not have a relapse prevention plan, defendant denied all sexual contact with children under age 14 on several occasions, and defendant did not believe that he suffered from pedophilia. As recently as the week before the trial, defendant told Dr. Rose that he did not suffer from pedophilia and that he had not had sexual contact with any child under the age of 14. Dr. Rose also explained that, although defendant had not demonstrated any overtly pedophilic behaviors at NSH, some "comments that he's made . . . give evidence to pedophilic behaviors." In particular, defendant told Dr. Rose that "relationships between an adult and a pubescent child are acceptable in many cultures." Defendant argued that such a practice was appropriate.

Dr. Rose also opined that defendant had not voluntarily followed his treatment plan. He explained that defendant's treatment plan required him to address his past instances of pedophilic behavior, and yet defendant had denied that he suffered from pedophilia and refused to address his past pedophilic conduct. Dr. Rose's opinion was also based on a report that specified that defendant told a psychiatrist that he attended sex-offender treatment only to satisfy the court and not because he believed he needed it. Although defendant had recently been appropriately participating in treatment, during the previous five months there had been a period of four to five weeks in which defendant did not attend sex-offender treatment due to argumentative behavior.

Dr. Rose finally opined that defendant posed a substantial danger of physical harm to others because of his pedophilia. His opinion was based on several factors: defendant's lack of insight regarding his pedophilia, defendant's lack of treatment to specifically address his dangerous behavior toward children, defendant's lack of planning and skills to prevent himself from engaging in sexual conduct with children in the future, 2006 actuarial testing that showed defendant posed a danger due to his pedophilia, defendant's statement that he attended sex-offender treatment only to satisfy the court, and defendant's poor judgment. Dr. Rose personally observed the following instances in which defendant exercised poor judgment: defendant told an NSH staff member that she was his "type of girl," defendant's statement that he did not believe there was any problem with patients having romantic relationships with NSH staff members, and defendant's presentation of justifications any time Dr. Rose informed him that romantic relationships between patients and NSH staff members were prohibited. Dr. Rose was also aware that defendant repeatedly called female NSH staff members "baby girl," and that defendant had written letters to staff members proposing sexual relationships. Dr. Rose emphasized that when making a determination regarding the risk posed by a

pedophile, "we are wanting to know whether or not they can make good judgments with regard to sexuality."

Defendant testified that he did not suffer from pedophilia and was not sexually attracted to children. He emphasized that there was no proof that he had pedophilia. He did not believe that he needed sex-offender treatment. Defendant noted, however, that "18 is not the magic bullet number of physically mature" for girls. He also testified that "the business of being an adult at 18 is actually arbitrary."

Defendant admitted that he molested a four-year-old girl, but he explained that it was an "occult ritual" in preparation for his role in the 1980s Iran hostage situation. Defendant testified that he molested the eight-year-old girl during a "test" to determine whether he could be a father. Defendant acknowledged that 14-year-old D.'s body was in "transition phase from little girl to grown woman," and he explained that he "was actually trying to help her get over the hump." He testified that "if [he] hadn't intervened in D.'s life, she would have killed herself."

Defendant described his wellness and recovery plan. Pursuant to that plan, defendant intended to live in Los Angeles and attend Alcoholic Anonymous and Sex Addicts Anonymous meetings. ~(RT 148-149)~

Dr. Douglas Korpi testified for defendant as an expert in the diagnosis of mental disorders and risk assessment. He evaluated defendant during an October 2012 interview, and he reviewed defendant's state hospital records. He diagnosed defendant with a "mild form" of pedophilia. He determined that defendant's pedophilia was not in remission, but he noted that the determination was made "in an abundance of caution." Dr. Korpi explained that defendant's narcissistic personality disorder, which was not a serious mental disorder, was "the primary diagnosis in this case." He noted that defendant's molestations of the four-year-old girl and the eight-year-old girl were "primarily" driven by defendant's pedophilia, but that defendant's narcissistic personality

5

disorder could also have been a factor in the molestations.  He explained that defendant's narcissistic personality disorder was a contributing factor in defendant's molestation of 14-year-old D.

Dr. Korpi opined that defendant did not pose a substantial danger of physical harm to others based on his pedophilia diagnosis.  In support of his opinion, Dr. Korpi cited the results of actuarial tests he administered to defendant, which showed that defendant posed a two to 10 percent chance of sexually reoffending in five years and a three to 16 percent chance of sexually reoffending in 10 years.  He opined that defendant had a "significant likelihood of doing stalking-like behavior" as a result of his narcissistic personality disorder.  He noted that defendant experienced delusions as part of his narcissistic personality disorder, and that defendant's delusions could cause him to sexually reoffend with an underage girl.

At the conclusion of the trial, the court found that the People had proved the allegations in the MDO petition beyond a reasonable doubt.  The court accordingly ordered defendant's involuntary commitment to be extended for one year.

Defendant filed a timely notice of appeal.  This appeal followed.

## DISCUSSION

Defendant argues that we must reverse the commitment order due to insufficient evidence.  Defendant attacks the sufficiency of the evidence in two respects:  1) he contends that there was insufficient evidence that his pedophilia was not in remission and could not be kept in remission without treatment; and 2) he contends that there was insufficient evidence that he represented a substantial danger of physical harm to others as a result of his pedophilia.  As explained below, defendant's contentions are unpersuasive.

"In considering the sufficiency of the evidence to support MDO findings, an appellate court must determine whether, on the whole record, a rational trier of fact could

6

have found that defendant is an MDO beyond a reasonable doubt, considering all the evidence in the light which is most favorable to the People, and drawing all inferences the trier could reasonably have made to support the finding. [Citation.] ' " 'Although we must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends. [Citation.] Thus, if the [finding] is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder. . . .' [Citation.]" ' " (*People v. Clark* (2000) 82 Cal.App.4th 1072, 1082-1083.)

Section 2972 mandates a one-year extension of an MDO's commitment if three criteria are satisfied: "If the court or jury finds that the patient has a severe mental disorder, that the patient's severe mental disorder is not in remission or cannot be kept in remission without treatment, and that by reason of his or her severe mental disorder, the patient represents a substantial danger of physical harm to others, the court shall order the patient recommitted to the facility in which the patient was confined at the time the petition was filed . . . . The commitment shall be for a period of one year from the date of termination of . . . a previous commitment . . . ." (§ 2972, subd. (c).) Thus, a recommitment "requires proof beyond a reasonable doubt that (1) the patient has a severe mental disorder; (2) the disorder 'is not in remission or cannot be kept in remission without treatment'; and (3) by reason of that disorder, the patient represents a substantial danger of physical harm to others." (*People v. Burroughs* (2005) 131 Cal.App.4th 1401, 1404.)

Section 2962 defines "remission" as follows: "The term 'remission' means a finding that the overt signs and symptoms of the severe mental disorder are controlled either by psychotropic medication or psychosocial support." (§ 2962, subd. (a)(3).) Section 2962 also defines the phrase "cannot be kept in remission without treatment": "A

7

person 'cannot be kept in remission without treatment" if during the year prior to the question being before the . . . trial court, he or she has been in remission and he or she has been physically violent, except in self-defense, or he or she has made a serious threat of substantial physical harm upon the person of another so as to cause the target of the threat to reasonably fear for his or her safety or the safety of his or her immediate family, or he or she has intentionally caused property damage, or he or she has not voluntarily followed the treatment plan. In determining if a person has voluntarily followed the treatment plan, the standard shall be whether the person has acted as a reasonable person would in following the treatment plan." (*Ibid.*)

Here, there was substantial evidence that defendant's pedophilia was not in remission. Dr. Rose and Dr. Korpi both opined that defendant's pedophilia was not in remission. Dr. Rose specifically opined that defendant's treatment had not caused defendant's pedophilia to remit. In explaining the basis of his opinion, Dr. Rose noted that defendant made comments that "give evidence to pedophilic behaviors." ~(RT 65)~ In particular, defendant argued with Dr. Rose and told him that relationships between adults and children are acceptable. Thus, there was substantial evidence that the signs and symptoms of defendant's pedophilia were not controlled by treatment. Indeed, defendant's own testimony suggested that his pedophilia was not in remission—he specifically testified that "18 is not the magic bullet number" for the physical maturity of girls. We therefore conclude that there was sufficient evidence that defendant's pedophilia was not in remission. (See § 2962, subd. (a)(3 [pedophilia is in remission if "the overt signs and symptoms . . . are controlled either by psychotropic medication or psychosocial support"].)

Even if we were to agree with defendant's claim that there was insufficient evidence that his pedophilia was not in remission, we would nonetheless conclude that there was substantial evidence that defendant's pedophilia could not be kept in remission

8

without treatment.  (See *People v. Beeson* (2002) 99 Cal.App.4th 1393, 1400 [where overt symptoms of a severe mental disorder are not present, the issue is whether the MDO can be kept in remission without treatment].)  Pedophilia cannot be kept in remission without treatment "where the person has been in remission for the past year, but also has . . . failed to voluntarily follow his treatment plan." (*Id.* at p. 1399.)  Whether a person has voluntarily followed his treatment plan is determined using a reasonable person standard.  (*Ibid.*)  Here, Dr. Rose opined that defendant had not voluntarily followed his treatment plan.  He explained that defendant's treatment plan required defendant to address his past instances of pedophilic behavior, but defendant repeatedly told Dr. Rose that he did not suffer from pedophilia and that he had not had sexual contact with children.  Dr. Rose also noted that that there had recently been a four-to-five-week period in which defendant failed to attend his sex-offender treatment.  "A reasonable person, whose mental disorder can be kept in remission with treatment, must, at minimum, acknowledge if possible the seriousness of his mental illness and cooperate in all the mandatory components of his treatment plan." (*Ibid.*)  Thus, Dr. Rose's testimony that defendant failed to acknowledge the existence of his pedophilia and failed to follow all of the components of his treatment plan constituted substantial evidence that defendant's pedophilia could not be kept in remission without treatment.

Finally, there was sufficient evidence that defendant presented a substantial danger of physical harm to others.  Dr. Rose opined that defendant posed a substantial danger of physical harm to others because of his pedophilia.  His opinion was based on many factors, including defendant's lack of planning and skills to prevent himself from engaging in sexual conduct with children, defendant's lack of insight regarding his pedophilia, and defendant's exercise of poor judgment in pursuing romantic and sexual relationships with NSH staff members.  Dr. Rose expressed concern regarding defendant's history of poor judgment, and he emphasized that the danger posed by a

9

pedophile is determined by "whether or not he can make good judgments with regard to sexuality." Dr. Rose's testimony constituted substantial evidence of defendant's dangerousness. (See Evid.Code, § 411 [the testimony of one witness may be sufficient to prove any fact]; *People v. Rasmuson* (2006) 145 Cal.App.4th 1487, 1508 [same].) Although Dr. Korpi disagreed with Dr. Rose's opinion regarding the danger associated with defendant's pedophilia, the "credibility of the experts and their conclusions were matters resolved against defendant" by the trier of fact, and "[w]e are not free to reweigh or reinterpret the evidence." (*People v. Mercer* (1999) 70 Cal.App.4th 463, 466-467.) Accordingly, we conclude that there was sufficient evidence that defendant posed a substantial danger of physical harm to others by reason of his pedophilia.

For the forgoing reasons, we conclude that sufficient evidence supported the trial court's MDO findings. We therefore must affirm the order extending defendant's involuntary commitment.

**DISPOSITION**

The order extending defendant's commitment is affirmed.


_____
                    RUSHING, P.J.



WE CONCUR:


_____
        PREMO, J.


_____
        ELIA, J.

10
