Filed 9/12/24

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C098000 |
| Plaintiff and Respondent, | (Super. Ct. No. 99F06254) |
| v. | |
| MICHAEL INGRAM, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Sacramento County, Alyson L. Lewis, Judge. Affirmed.

Rudy Kraft, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans, Jessica C. Leal, Deputy Attorneys General, for Plaintiff and Respondent.

In 2017, a jury found defendant Michael Ingram was a sexually violent predator and he was committed for an indeterminate term to the State Department of State Hospitals (DSH) pursuant to the Sexually Violent Predator Act (SVPA; Welf. & Inst.

1

Code, § 6600 et seq.).[1]  In 2020, he filed a petition for conditional release.  In order to prevail on his petition, he had to prove it was not likely he would engage in sexually violent criminal behavior if released under supervision and treatment in the community. The trial court denied the petition.  Ingram appeals, challenging both the trial court's decision and the constitutionality of the conditional release provisions of the SVPA.  We find the trial court's decision is supported by the evidence and Ingram fails to convince us the trial court misunderstood or misapplied the law.  We also find Ingram's constitutional challenges are not properly before us.  We thus affirm.

## LEGAL BACKGROUND

Before discussing the factual and procedural background of this case, we begin with a description of the relevant provisions of the SVPA.  The SVPA "allows for the involuntary commitment of certain convicted sex offenders, whose diagnosed mental disorders make them likely to reoffend if released at the end of their prison terms." (*Cooley v. Superior Court* (2002) 29 Cal.4th 228, 235.)  A person can only be civilly committed if, after a trial, a judge or a unanimous jury finds beyond a reasonable doubt the person is a sexually violent predator (SVP).  (§§ 6600, 6601, 6603, 6604; see also *Cooley*, at p. 243.)

An SVP is defined as a person who has been convicted of at least one enumerated sexually violent offense (including lewd and lascivious acts on a child under the age of 14), and who has a diagnosed mental disorder that makes it likely he or she will engage in sexually violent and predatory criminal behavior if released.  (§ 6600, subds. (a)(1), (b); *Walker v. Superior Court* (2021) 12 Cal.5th 177, 190.)  A diagnosed mental disorder "includes a congenital or acquired condition affecting the emotional or volitional capacity that predisposes the person to the commission of criminal sexual acts in a degree

---

[1]     Further undesigned statutory references are to the Welfare and Institutions Code.

2

constituting the person a menace to the health and safety of others." (§ 6600, subd. (c).) Pedophilic disorder can be a qualifying mental disorder. (See *People v. McKee* (2012) 207 Cal.App.4th 1325, 1344 [60 to 66 percent of SVPs have been diagnosed with pedophilia]; *People v. Mercer* (1999) 70 Cal.App.4th 463, 466 [pedophilia is a "mental disorder" as defined by SVPA].)

If the person is found to be an SVP, the court orders them committed to DSH "for an indefinite term . . . for appropriate treatment and confinement in a secure facility." (§ 6604.)

The SVPA was not designed to be punitive. (*Hubbart v. Superior Court* (1999) 19 Cal.4th 1138, 1144.) Instead, it was "designed ' "to provide 'treatment' to mentally disordered individuals who cannot control sexually violent criminal behavior" ' and to keep them confined until they no longer pose a threat to the public." (*People v. Putney* (2016) 1 Cal.App.5th 1058, 1065; see also § 6606, subds. (a), (c) [SVP "shall be provided with . . . treatment for his or her diagnosed mental disorder"].) "Because the SVPA is designed to ensure a committed person does not remain confined any longer than he or she qualifies as a sexually violent predator, it provides means for that individual to obtain review of his or her mental condition to determine if civil confinement is still necessary. [Citation.] One of two ways such review may be had is by petition for *conditional release* . . . under section 6608."[2] (*People v. Collins* (2003) 110 Cal.App.4th 340, 346, italics added.) This appeal involves a petition for conditional release.

Conditional release proceedings can be initiated by either DSH or the committed person. DSH can initiate release proceedings if it "determines that the person's diagnosed mental disorder has so changed that the person is not likely to commit acts of

---

[2] A committed person may also file a petition for *unconditional* release, but that is not what Ingram did here, and his own expert agrees he is not suitable for unconditional release.

3

predatory sexual violence while under supervision and treatment in the community." (§ 6607, subd. (a).)  Here, DSH did not make such a determination — indeed, as discussed in more detail below, in DSH's opinion, Ingram should *not* be conditionally released.  Even without DSH's concurrence, however, the committed person can still petition the court for conditional release after one year of commitment — and that is what Ingram did in this case.  (See § 6608, subds. (a), (c), (f).)

Unless the trial court determines such a petition is frivolous, it "shall hold a hearing to determine whether the person committed would be a danger to the health and safety of others in that it is likely that the person will engage in sexually violent criminal behavior due to the person's diagnosed mental disorder if under supervision and treatment in the community."  (§ 6608, subd. (g).)  Before the hearing, the court must obtain a written recommendation on the appropriateness of conditional release from both DSH and the director of the state-operated forensic conditional release program.  (§ 6608, subds (e), (f).)  The committed person is entitled to the assistance of counsel and the appointment of experts, and the state is entitled to have the committed person evaluated by its own experts.  (§ 6608, subds. (a), (g).)  At the hearing, "the committed person shall have the burden of proof by a preponderance of the evidence" (§ 6608, subd. (k)), and must prove "he or she is not likely to engage in sexually violent criminal behavior if released under supervision and treatment."  (*People v. Rasmuson* (2006) 145 Cal.App.4th 1487, 1505-1506.)  The word "likely" in this context means " 'the person presents a *substantial danger*, that is, *a serious and well-founded risk*, that he or she will commit such crimes if free in the community.' "  (*Id*. at p. 1506.)

With this legal background in mind, we turn to the factual and procedural background of this case.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. Ingram's Sex Offense History[3]

In 1984, Ingram was charged with two counts of lewd and lascivious acts on a child under the age of 14 and one count of sexual battery. He was 25 at the time. The victims were an 11-year-old boy, a 7-year-old boy, and a 4-year-old girl who Ingram was babysitting. It was alleged he rubbed the older boy's buttocks and genitals over his clothes, told the younger boy to remove his pants, and removed the girl's clothing and felt all around her. The lewd and lascivious acts counts were dismissed, and he was convicted of one count of sexual battery and sentenced to six months in jail.

Two years later, Ingram was arrested for sodomy and oral copulation of a developmentally disabled 23-year-old man. It was alleged he dragged the victim to a field and had forced oral copulation and anal sex. The charges were subsequently dismissed.

The next year, Ingram was arrested for lewd and lascivious acts on a child under the age of 14 and failing to register as a sex offender. The victim was an 11-year-old boy. It was alleged Ingram fondled the boy's penis through his clothing while engaged in a wrestling match. Ingram appeared to be intoxicated at the time. He pled guilty to annoying or molesting a child, and the lewd and lascivious acts charge was dismissed. He was sentenced to six months in jail.

Three years later, in 1990, Ingram was convicted of one count of lewd and lascivious acts with a child under the age of 14. The victim was a 7-year-old boy who stated Ingram invited him over to watch television. Ingram put his hands inside the boy's

---

[3]    We note the record contains almost none of the underlying criminal records. Our description of Ingram's criminal history thus comes almost exclusively from the various experts' reports, including Ingram's, that summarize that history.

shorts and squeezed his penis and testicles several times. Ingram was 31. He was sentenced to six years in prison. It is unclear when he was released.

In 1999, Ingram was once again convicted of two counts of lewd and lascivious acts on a child under the age of 14. This time, the victim was a 12-year-old boy and Ingram was 40. The victim stated that on two separate occasions Ingram touched his penis, orally copulated him, and digitally penetrated his anus. Ingram was sentenced to 17 years in prison.

### 2. SVPA Commitment Proceedings

Prior to Ingram's release from prison on the 1999 conviction for lewd and lascivious acts, proceedings were initiated to have him civilly committed as an SVP pursuant to the SVPA. He was transferred to DSH in 2014 pending his trial. In 2017, a jury found he was an SVP and the trial court ordered he be indefinitely committed to DSH. The initial commitment proceedings are not at issue here.

### 3. The Present Petition and the Hearing Thereon

In 2019, Ingram filed a petition for conditional release, and a hearing on the petition was held in early 2023. Two people testified at the hearing, both on behalf of Ingram: his expert, Dr. Gerry Blasingame, and Judith Licciardello, a client services manager for Alta California Regional Center. The parties also stipulated to the admission of written reports from Dr. Blasingame and the state's four experts, and waived hearsay objections to the reports. The state's experts were: Drs. Koreen Hudak and Christina O'Sullivan, who evaluated Ingram specifically for the hearing; Dr. Harry Goldberg, who performed the annual evaluation of Ingram required by section 6604.9; and Dr. Sarah Evans, a program evaluator for the state's conditional release program, known as CONREP, which is run by Liberty Healthcare (the program is thus frequently referred to as Liberty/CONREP).

### 4. The Experts' Opinions

We note at the outset that the experts agreed on many important facts. For

6

example, they agreed Ingram continued to meet the definition of an SVP (i.e., they agreed he still had a diagnosed mental disorder that made it likely he would engage in sexually violent behavior if released). They also largely agreed on his diagnosed mental disorders: pedophilic disorder and alcohol use disorder, and either a "mild intellectual disability" or "borderline intellectual functioning." Dr. Blasingame believed Ingram had a mild intellectual disability rather than borderline intellectual functioning, but he did not clearly explain the difference between the two, other than to note it "is not just a matter of semantics." We are not convinced the disagreement is particularly relevant because everyone agreed Ingram had intellectual challenges, and that his slow progress in DSH's sex offender treatment program was attributable, at least in part, to those challenges. Indeed, as early as 2014, a DSH clinician opined Ingram would have difficulty reading or understanding anything written beyond an early grade level; it would be challenging to teach him new information, especially if it was lengthy or complex; and it was "unclear" whether he was "capable of learning and generalizing functional skills."

The experts also agreed Ingram's risk of reoffending was "above average" based on various instruments and tools designed to estimate that risk, and the state's experts opined it may actually be "well above average." Whether his risk was classified as above average or well above average, however, it was a " 'serious and well-founded risk' " — and Ingram does not seriously suggest otherwise. (*People v. Rasmuson, supra*, 145 Cal.App.4th at p. 1506, italics omitted.)

The experts also agreed (or at least they all noted) Ingram completed a penile plethysmograph (PPG) assessment[4] in 2020, which showed he had significant sexual

---

[4] "The PPG is a physiological measure of sexual arousal which measures penile engorgement to assess sexual arousal in response to sexually explicit images depicting males and females of different ages." (*People v. Grassini* (2003) 113 Cal.App.4th 765, 770, fn. 2.)

arousal to images of underage males.  It was also noted his "self-reported estimates of his arousal to the underage male stimuli were generally inconsistent with the arousal responses recorded by the PPG."

Finally, and critically, the experts agreed Ingram was not suitable for the typical conditional release to Liberty/CONREP.  As discussed in more detail below, however, Ingram's expert believed it would be possible to create an alternative to the typical conditional release that would both (1) provide him with the specialized sex offender treatment he needs to accommodate his intellectual disability, and (2) provide 24/7, one-on-one, line-of-sight supervision to ensure he does not reoffend.

With the experts' agreement on these critical facts in mind, we briefly summarize their description of Ingram's psychosocial history and treatment progress (and we emphasize that the experts mostly agreed here as well).

Ingram had seizures as a child and may have suffered some type of head injury. Cognitive tests showed he had an IQ ranging from 58 to 76, possible neurological impairment, and skills far below his grade level.  He was classified as "educable mentally retarded" and enrolled in special education classes.  He graduated from high school in 1977 and did not attend college.

He began drinking at an early age and has a history of alcohol abuse.  It appears he was intoxicated during at least one of his sexual offenses.

His work history is limited.  According to Dr. Blasingame, he never held a full-time job and he lived with his mother (and possibly in a group home) when he was not incarcerated.

He has a history of interpersonal difficulties.  He has never been married or had a long-term relationship with an adult male or female.  DSH staff noted he was socially awkward and easily frustrated.

He had previously participated in court-ordered outpatient sex offender treatment, but few details about the treatment were provided. According to Dr. Blasingame, he was enrolled in sex offender treatment for two years in the late 1980s.

Ingram's progress in DSH's sex offender treatment program (or SOTP) had been slow. The SOTP is a structured program whose "fundamental goal . . . is to teach sex offenders how not to reoffend." It has four modules that patients progress through sequentially. Ingram had completed Module I of the SOTP but had not yet completed Module II.

Ingram began Module I in 2014, and initially had difficulties and stated he was confused and did not understand the materials. He was transferred to "an assisted group" "designed for those with intellectual and learning difficulties," and he thereafter "readily" completed Module I and was advanced to Module II

He made "little progress" in Module II between 2015 and 2017, and frequently declined to participate. He claimed he was " 'overwhelmed' " and frustrated by his inability to understand the materials and complete his assignments. There is also a suggestion he stopped treatment during this time period "due to a legal letter advising him not to discuss his case."

In 2018, he re-enrolled in an "assisted group," and although it appeared he had generally maintained enrollment in the group, his progress had been slow. DSH records noted he "rebuffed offers of help from others (peers and facilitators alike) while at the same time complain[ing] that he was unable to complete his assignments . . . because he did not understand" them. A social worker tried to help him complete a "personal history" by reading through and explaining the questions, but the task proved difficult because "Ingram continually stated that he could not remember anything. There appeared to be discrepancies in his reporting as he often claimed he has no recollection of things, yet in later unrelated questions there would be evidence of existing memories related to previous questions." He refused "a peer mentor because he report[ed] he did not get

9

along with his previous peer mentor and did not want to work with another." He attended groups, but rarely participated because he was " 'wary of sharing any personal information about himself for fear of his statements being taken out of context.' "

In late 2021, he agreed to attend several individual weekly meetings with his psychologist, Dr. Dixon, to work on SOTP assignments. According to Dr. Blasingame, Dr. Dixon was "one example of a clinician that actually seemed to get it and understand [Ingram] and . . . his needs." Dr. Dixon reported Ingram initially made "significant progress during the sessions"; however, his motivation and progress began to wane, and by the end of the year, he refused to meet with Dr. Dixon and stated he " 'would not be able to continue' " his SOTP participation.

Ingram's participation and progress in Module II "continued to vacillate" in 2022. In May, for example, his progress was updated from " 'no progress/minimal progress' " to " 'acceptable progress,' " and it was noted he had recently made " 'major strides' " by " 'talking more about his sex offense history and explaining more of his story to other group members' " and becoming more receptive to feedback. This was a "big step forward . . . because in the past he has repeatedly insisted that he did not remember anything about the crimes." A few months later, however, his progress was returned to "minimal" and it was noted he became " 'unusually frustrated if anyone . . . is smiling or humor is utilized in group' " and he " 'may have difficulty reading facial cues.' "

Ingram's expert, Dr. Blasingame, acknowledged there were "only a few periods in the recent couple three years where [Ingram] actually did engage with the treatment providers and that would last for a few months and then it would go away." Dr. Blasingame also acknowledged, "There is no question that [Ingram] needs 'more treatment progress.' "

All of the experts interviewed Ingram and asked him about his sexual offense history. He initially denied to Dr. Goldberg that he was attracted to children. Later, however, he told Dr. Goldberg he had masturbated the night before while "thinking about

one of his victims." He told Dr. Goldberg he might have committed his sexual offenses due to boredom or curiosity or because he "could not make friends with other people his age." When Dr. Goldberg asked him "who suffered more, him or the victims," he responded that he did, "because he missed out on 20 years of his life" and "the victims were able to mend their lives and proceed."

He told Dr. Hudak he was " 'sometimes' " sexually attracted to children, but " 'lately, no, because I know it is wrong.' " He acknowledged having sexual thoughts about children in the past and having masturbated to those sexual thoughts, but denied he currently had sexual thoughts about children and claimed he had not masturbated in 21 years. When Dr. Hudak asked what it was about children he found sexually arousing, he responded, " 'I don't know, I've never really thought about it.' "

He was reluctant to discuss his sexual offenses with Dr. O'Sullivan, but he did not deny them either. When asked why he thought he committed his sexual offenses, he responded, " 'just not fitting in.' " He stated, " 'every child needs a place to go, a safe place. But I got my needs over here. And they overlapped.' " Dr. O'Sullivan noted, "He seemed troubled by his pedophilic urges and to be using rather primitive defense mechanisms to compensate (e.g., denial, regression and projection). Instead of acknowledging a sexual attraction to children, Mr. Ingram offered various implausible explanations for his offense history."

He told Dr. Evans his pedophilic diagnosis " 'doesn't exist anymore. I learned from what I did, and I no longer do that.' " According to Dr. Evans, he engaged "in minimization and denial when discussing his sexual offense history." He blamed the offenses on " 'being alone' " and "drinking," and also stated, " 'I wanted to have sex but there was no one available at the time." When asked about potential triggers for reoffending, he stated, " 'I will need to stay away from parks as far as I can and as much as I can, and if possible, as far as I can from kids.' "

11

Finally, Dr. Blasingame asked Ingram "if he got enjoyment from touching kids," and he responded, " 'that is a hard question.' " Dr. Blasingame also asked Ingram "what made boys sexy to him" and explained "sexy included thinking about touching someone's private parts, like a penis, or wanted to look at the person naked while touching one's own privates." Ingram responded, " 'curiosity.' He said that he might have felt bored or lonely. He added that it might have been for enjoyment or to entertain him." Dr. Blasingame testified Ingram's response "was close to insight, . . . considering . . . [his] cognitive issues."

All four of the state's expert opined Ingram was not suitable for conditional release because (among other things): he still met the definition of a SVP; the results of his PPG indicated he continued to be sexually aroused by prepubescent boys and he had not yet developed skills to manage and/or suppress that arousal; he lacked an understanding of his pedophilic disorder and the dynamic risk factors that are related to his sexual offending; his risk assessment scores placed him in the above average or well above average risk of reoffense; he was still in the early stages of sex offender treatment and continued to struggle with the materials and concepts; and his plan for preventing relapse (i.e., *I don't do that anymore* or *I'll try to stay away from kids*) was not adequate.

As noted above, even Ingram's own expert agreed he was not suitable for conditional release — at least to the conditional release program run by Liberty. According to Dr. Evans, the Liberty/CONREP evaluator, "Suitable Liberty/CONREP candidates are able to demonstrate that they possess robust management/suppression skills that they are able to effectively employ in times of need (e.g., when experiencing a deviant sexual thought or fantasy). [¶] Success in CONREP relies upon each patient having learned self-management skills, a thorough understanding of triggers to relapse, and a plan to safely integrate into the community. . . . In particular, evaluators are looking for ability to use treatment effectively, ability to be transparent with one's Treatment Team, insight into the precursors of the sexual offending, and the

12

establishment of behavioral and emotional control mechanisms to ensure safety for self and others." Dr. Blasingame did not disagree with any of this. He was aware that Liberty "runs the only ConRep program. They are the sole vendor" and the "only game in town." He also acknowledged, "ConRep expects people to be able to function independently . . . but . . . [Ingram] is not going to be able to do that." Finally, and critically, he agreed Ingram was not suitable for what he called the "typical" conditional release because "he's going to need a degree of attention and services that ConRep doesn't provide."

In Dr. Blasingame's opinion, however, it would be possible for the court to approve an *alternative* to the typical Liberty/CONREP release that would both (1) provide Ingram with the intensive support, treatment, and services he needs and (2) keep the community safe. Dr. Blasingame described in great detail what such an alternative program would require. Among other things, Ingram would need to be placed in an "adult residential facility" or a "specialized adult residential treatment home" that serves adults with intellectual disabilities and a history of a sexual offending. Ingram would also need "an elevated level of staffing and enhanced supervision." In particular, he would need one-on-one supervision by staff members who are not "shared with any other clients or distracted by other duties." The assigned staff members would need to maintain "close physical proximity" to Ingram at all times (except when he is in the bathroom or his bedroom) in order "to be able see and hear his communications with other persons as well as being able to intervene in any given situation. This protective supervision is often referred to as 'line-of-sight' or 'arm's length' supervision." This intensive supervision would be required "well into the foreseeable future" or "for the foreseeable decades." Dr. Blasingame believed Liberty/CONREP could work with Alta California Regional Center to create and provide such an alternative program.

5.    **Testimony of Judith Licciardello**

Judith Licciardello is a client services manager for Alta California Regional Center. Regional centers coordinate the provision of services and supports to people with

13

developmental disabilities "by contracting with 'direct service providers,' who are also called vendors." (*A.L. v. Harbor Developmental Disabilities Foundation* (2024) 102 Cal.App.5th 477, 486.) Ingram was assigned to Licciardello's caseload, but Alta California Regional Center was not providing him with services because he was confined to DSH. Licciardello did not offer an opinion on whether Ingram was suitable or safe for conditional release. Instead, she testified about the types of services that might be available to him if he were conditionally released.

Licciardello testified there are no facilities or homes in or around Sacramento County "that could support [Ingram] and his SVP status." However, she contacted the other regional centers in the state and found a home in San Bernardino County (Knighton Care Home) that she believed could do so. She testified the home is in a "very rural remote part of San Bernardino County" and "is not close to . . . any neighborhoods or any schools," which is "one of the major reasons why they are able to meet someone's SVP status." She testified, "All of the residents in the home are SVP status," and the home has "experience working with ConRep and Liberty." She testified the home is a "level four" home, and although she did not explain exactly what that means, it appears to refer to a home that provides a higher level of support and supervision. She clarified, however, that care homes are not locked facilities and "[i]f someone insists on leaving the home, the home cannot stop them from leaving." She explained, "If it was an instance of someone having SVP status and they are not supposed to leave, then there would need to be [a] protocol in place on who to call, whether that be ConRep, probation or 911." She was asked whether the home was willing to put such a protocol in place, she responded, "Yes. At that time, they expressed that they would mostly because they said that there is nowhere to go." She had not discussed the possibility of placing Ingram in this home with Liberty/CONREP and did not know whether Liberty would approve such a placement.

14

## 6. The Trial Court's Ruling

At the end of the hearing, Ingram's attorney summed up his argument as follows: "We all know that ConRep is . . . the vendor that has the contract [to run the state's conditional release program], but we also know that ConRep can work with other service providers and . . . can be augmented if needed in cases where people might have disabilities or cognitive issues that make a . . . typical ConRep placement difficult or impossible." "[Ingram] obviously cannot be released into the community safely unconditionally, but there are circumstances where he could be conditionally released safely into the community. [¶] I maintain that ConRep working with Alta Regional [Center] who contracts with services providers, contracts with . . . level four residential homes that can provide the right oversight, the right . . . sex offender treatment, the right supervision, the right monitoring and in a place . . . which is removed from schools, children, anything of that sort, I think [Ingram] can be safely released under that kind of supervision and treatment."

The trial court denied Ingram's petition for conditional release. It noted it found Dr. Blasingame's testimony "the most helpful," and while it "appreciate[d]" Licciardello's testimony, it "did not find it to be particularly helpful for the issues that are presented." It noted Ingram's risk to the community was "virtually unchanged since his commitment" and he had not made significant progress in completing the SOTP. It also noted that while where might be legitimate reasons for that (i.e., his intellectual disability), "the remedy for that is not release to the community. [¶] If [ ] Ingram quarrels with the services being provided to him at a level that he understands and is able to complete, the remedy would be an action against Coalinga State Hospital for failure to reasonably accommodate his disability. [¶] The remedy is not release under the Sexually Violent Predator Act." Finally, it stated, "the testimony that was provided is that [ ] Ingram's unlawful attraction won't be cured, that he remains an above average risk to the community, and while he may get better treatment in the community than he's getting in

15

Coalinga State Hospital, that is not the issue before the Court . . . . [¶] So based on all of the evidence that was presented by the Petitioner, the petition in this case for conditional release is denied."

Ingram filed a timely notice of appeal.

## ANALYSIS

Ingram challenges both (1) the trial court's order denying the petition, and (2) the constitutionality of the SVPA's conditional release provisions. We begin with Ingram's challenges to the order denying the petition and then consider his constitutional challenges.

### 1.    Order Denying the Petition

In reviewing the trial court's order, we apply the substantial evidence standard to review any factual findings, and we interpret the SVPA de novo. (*People v. Rasmuson, supra*, 145 Cal.App.4th at p. 1504; *Walker v. Superior Court, supra*, 12 Cal.5th at p. 194.)

### A. *The Trial Court Applied the Correct Standard*

Ingram's first argument is that the trial court misunderstood or misapplied the law and erroneously believed he had to prove he presented *no risk* or *no danger* of reoffending if conditionally released, when, in fact, he had to prove only that he was *not likely* to reoffend. We agree Ingram did not have to prove he presented no risk or no danger of reoffending. Section 6608, subdivision (g) states that the trial court must determine whether "it is *likely* that the person will engage in sexually violent criminal behavior . . . if under supervision and treatment in the community." (Italics added.) And in *People v. Rasmuson, supra*, 145 Cal.App.4th 1487, the court held the term " 'likely' " means the person "presents a *substantial danger*" or "a *serious and well-founded risk*" of reoffense, and it never suggested the person had to prove he or she presented no danger or no risk of reoffense. (*Id*. at p. 1506; see *id*. at pp. 1505-1507.) Even the People agree Ingram had to prove "it was *not likely* he would sexually reoffend . . . if under

16

supervision and treatment in the community," and did not have to prove there was no risk he would reoffend.  (Italics added.)

Ingram believes the trial court misinterpreted the law and effectively required him to prove a higher (and arguably impossible) *no danger* standard because the district attorney argued at the hearing below that Ingram had to prove he "will pose *no danger* to others if under outpatient supervision and treatment."  But as even Ingram admits, "the trial court did not explicitly announce that it was applying the 'no danger' standard."  And more to the point, the trial court correctly stated the standard, as follows:  "[T]he finding that the Court must make in these proceedings is that the Petitioner would not be a danger to the health and safety of others *in that it is not likely that the person will engage in sexually violent criminal behaviors* due to the person's diagnosed mental disorder while under the supervision and treatment in the community."  (Italics added.)  The trial court then asked both parties whether they agreed that is what it had to find, and both parties agreed it was.   Thus, regardless of what the district attorney argued below, the trial court correctly stated the law, and nothing in the record suggests the trial court failed to apply the law as stated.

" 'We presume that the court properly applied the law . . . unless the appellant affirmatively shows otherwise.' "  (*People v. Mataele* (2022) 13 Cal.5th 372, 414; see also *McDermott Will & Emery LLP v. Superior Court* (2017) 10 Cal.App.5th 1083, 1103 ["We presume the trial court knew and properly applied the law absent evidence to the contrary"].)  Ingram fails to affirmatively show the trial court required him to prove he posed *no* danger to others if conditionally released or that it otherwise failed to properly apply the law.

### B.  *Substantial Evidence Supports the Trial Court's Decision*

Ingram's remaining arguments all deal with his contention that he proved he could be safely conditionally released to an alternative program that included the enhanced levels of treatment and supervision recommended by Dr. Blasingame.  Before discussing

these arguments, we note Ingram acknowledges, "Clearly, the standard SVP CONREP program is not appropriate" for him. And again: "[He] acknowledge[s] that he remain[s] an SVP and that he would not be suitable for placement in the community using the standard CONREP treatment program." At first blush, this would appear to dispose of this appeal, because it is tantamount to acknowledging he failed to prove he is not likely to reoffend if conditionally released to the only conditional release program in the state.

Ingram argues, however, that the state cannot create or contract with a single "one-size-fits all" conditional release program, and then deny him conditional release because he cannot meet its requirements due to his intellectual disability. He also argues that, if CONREP does not provide an appropriate alternative program, the court could order it to do so, perhaps by working with a regional center like Alta California Regional Center to locate and fund specialized housing and services. Finally, he argues he presented substantial evidence that he could safely be released to such an alternative program, and the state presented no evidence to the contrary. Although some of his arguments are colorable in the abstract, we ultimately affirm the trial court's order for the reasons stated below.

Ingram begins by citing various provisions in the SVPA that he claims demonstrate there can be more than one conditional release program, and the trial court has flexibility to select among such programs and to modify their terms and conditions to create a program that is suitable for each particular individual. (See, e.g., §§ 6608, subd. (h) [trial court shall obtain recommendation on "which forensic conditional release program is most appropriate"], 6608.8, subd. (b) ["The terms and conditions of conditional release shall be drafted to include reasonable flexibility to achieve the aims of conditional release, and to protect the public and the conditionally released person"], 6609.1, subd. (c) [trial court may "approve, modify, or reject" state's "recommendation or proposal regarding" terms and conditions of conditional release if it finds they are "not appropriate"].) We need not analyze his arguments in much detail because the People

18

acknowledge the SVPA *allows* alternative conditional release programs, and we agree. The People argue, however, that nothing in the SVPA *requires* alternative programs, and we agree with this as well. Merely stating the SVPA allows but does not require alternative programs, however, does not dispose of this appeal. Instead, the question in this case is whether the SVPA and the evidence admitted at the hearing required the trial court to find Ingram could be safely conditionally released to an alternative program that includes the enhanced treatment and supervision recommended by Dr. Blasingame. We conclude the answer to that question is no. In order to explain our conclusion, we first address Ingram's specific criticisms about the standard conditional release program overseen by Liberty/CONREP, namely that (1) it is not reasonable, (2) it does not reasonably accommodate his intellectual disability, and (3) it fails to include time in a locked facility. We then address his argument that he presented substantial evidence he could be safely supervised and treated in the community, and the state presented no evidence to the contrary.

i. *CONREP's expectations and conditions are reasonable*

Ingram argues "SVP outpatient release conditions must be reasonable," and "must be subject to challenge when they are not." He cites only one case to support his argument: *People v. Bryant* (2021) 11 Cal.5th 976. *People v. Bryant* is inapplicable. The question there was whether a condition of mandatory supervision imposed by the court upon the defendant's release from jail (namely, submitting to a search of any electronic device in the defendant's possession) was reasonable. (*Id*. at p. 981.) This case does not involve a condition of mandatory supervision.

Moreover, and more importantly, even if we were to assume for the sake of argument that release conditions must be reasonable, Ingram fails to convince us the release conditions in this case are unreasonable. He argues it is not reasonable to expect him to comply with the requirements of a typical CONREP release because his disability prevents him from progressing through DSH's SOTP. We disagree. We note initially that

Ingram's failure to complete the SOTP is not the primary reason the state's experts believed he was unsuitable for conditional release. This is because completing the program is not an end in and of itself; it is means to an end — namely, teaching SVPs how not to reoffend if released. What the state's experts believed was that Ingram was unsuitable for conditional release because he had not yet learned how not to reoffend. As Dr. Evans explained, CONREP expects people on conditional release to "possess robust management/suppression skills that they are able to effectively employ in times of need (e.g., when experiencing a deviant sexual thought or fantasy)." CONREP also expects them to have "a thorough understanding of triggers to relapse," "a plan to safely integrate into the community," the "ability to use treatment effectively[ and] be transparent with one's Treatment Team, insight into the precursors of the sexual offending, and the establishment of behavioral and emotional control mechanisms to ensure safety for self and others." All of these expectations are eminently reasonable, and the goal of the SOTP is to teach people how to meet them. All of these expectations are also directly related to the SVPA's requirement that an SVP must prove he or she is not likely to reoffend if conditionally released. (§ 6608, subd. (g); *People v. Rasmuson, supra*, 145 Cal.App.4th at pp. 1505-1506.)

These expectations also align with the goals of the SVPA. As noted above, the SVPA was "designed ' " to provide 'treatment' to mentally disordered individuals who cannot control sexually violent criminal behavior" ' and to keep them confined until they no longer pose a threat to the public." (*People v. Putney, supra*, 1 Cal.App.5th at p. 1065.) The SVPA is thus based on the principle that until an SVP has learned to control his or her sexually violent behavior, he or she continues to pose a threat to the public and must remain confined. Disability or no disability, there is nothing unreasonable about requiring SVPs to learn how to control their sexually violent behavior before they are conditionally released. Here, however, even Ingram's expert acknowledged he had not yet learned to control his sexually violent behavior, as

20

evidenced by the fact that he agreed Ingram continued to meet the definition of a SVP and would require constant supervision if conditionally released.

What Ingram's expert effectively believed is that *others* can control Ingram's sexually violent behavior for him — i.e., he believed Ingram is not likely to reoffend if he is provided with 24/7, one-on-one, line-of-sight supervision for the foreseeable future. Control by others, however, is not the premise of conditional release. If it was, there would be no need to civilly commit SVPs in the first place and they could all be supervised, controlled, and treated in the community. Indeed, Ingram comes close to acknowledging as much when he states, "if the conditional release program involved each patient being accompanied 24 hours a day by three security guards, a psychologist, a social worker, a nurse, and a psychiatrist, everyone could be safely treated in the community." He admits that his hypothetical scenario is a "ridiculous extreme[]" and we agree. Dr. Blasingame's recommendation, however, is not that much less of a ridiculous extreme than Ingram's hypothetical, and the only difference between the two is the number of people assigned to accompany the SVP at all times. In any event, we find Dr. Blasingame's recommendation is neither reasonable nor required by the SVPA, and the trial court was not required to adopt it.

ii. *A petition for conditional release does not raise reasonable accommodation issues*

Ingram argues the Americans with Disabilities Act of 1990 (ADA; 42 U.S.C. § 12101 et seq.) requires DSH and Liberty/CONREP to reasonably accommodate his intellectual disability by modifying the SOTP and the conditional release program so that he has the same opportunity to obtain conditional release as others. Relatedly, he argues he "can be better accommodated in an appropriate outpatient program, than at the state hospital." Whatever we think of these arguments in the abstract, we agree with the trial court's comment that a petition for conditional release is not the proper forum to litigate reasonable accommodation issues. When ruling on such a petition, the only question for

21

the court to decide is whether the petitioner met his or her burden of proving he or she is not likely to reoffend if conditionally released. (See § 6608, subd. (g); *People v. Rasmuson, supra*, 145 Cal.App.4th at pp. 1505-1506.) Whether reasonable accommodations are required in order to make treatment or conditional release more accessible to someone with an intellectual disability or whether someone's disability can be better accommodated somewhere other than DSH are simply not part of that equation.

It is perhaps telling that the only case Ingram cites to support his reasonable accommodation argument is *Atayde v. Napa State Hospital* (2017) 255 F.Supp.3d 978, which involved a lawsuit that included an ADA claim. The lawsuit was filed on behalf of a decedent who committed suicide in the county jail after having been found incompetent to stand trial and ordered committed to Napa State Hospital (NSH) for treatment. The lawsuit alleged the county and NSH violated the ADA because they failed to timely transfer the decedent to NSH, and as a result of this failure, he "was excluded from participating in NSH's mental health services and given no possibility of access to those programs." (*Id*. at p. 1003; see *id*. at pp. 985-986, 1003-1004.) Unlike *Atayde*, however, this is not an ADA lawsuit.

    iii.    *Ingram's "locked facility" argument is not applicable*

Ingram argues the plain language of the SVPA demonstrates a conditional release program can include at least some inpatient treatment in a locked facility, and "CONREP's policy of only running an outpatient program that does not use a locked facility is not contemplated by the law." He then argues an "appropriate" conditional release program for him "would probably involve . . . being initially placed at a locked facility." Maybe so, but at the hearing Ingram did not propose simply trading one locked facility for another. Indeed, his expert, Dr. Blasingame, expressly opined he should *not* be placed in a locked facility, explaining, "While a period of orientation to the new home and surroundings is appropriate, *having a mandatory . . . lock-down for his first months in placement is not in anyone's best interest and could be disastrous for his transition*."

22

(Italics added.) And, although Dr. Blasingame recommended he be placed in a facility that provides 24-hour nonmedical residential care, Licciardello's testimony made it clear that such facilities are not locked. Thus, whatever the merits of Ingram's argument that conditional release can include time in a locked facility, that argument has no relevance to the facts of this case and is directly at odds with the evidence he presented at the hearing.

iv. *The evidence does not compel a finding Ingram could be safely conditionally released*

Finally, we disagree with Ingram's argument that he presented substantial evidence he could be safely conditionally released to an alternative program as recommended by Dr. Blasingame, and the state presented no evidence to the contrary. Instead, we find Ingram's evidence much weaker and more equivocal than he acknowledges.

Ingram's primary evidence was Dr. Blasingame's testimony and written reports. Dr. Blasingame, however, did not focus on community safety or the likelihood that Ingram would reoffend if conditionally released. Instead, he focused on Ingram's intellectual disability, how his treatment progress (or lack thereof) would be affected by his disability, and what types of accommodations or adaptations would need to be made in order for him to progress in treatment. As characterized by Ingram, "[Dr.] Blasingame was not testifying as an expert in SVP treatment. He was testifying as an expert in the type of intellectual disability suffered by [Ingram] and the appropriate way to teach and treat people with similar disabilities." In other words, Dr. Blasingame was not testifying as an expert on the only issue the court had to decide — namely, whether Ingram was likely to reoffend if conditionally released. As to *that* issue, Dr. Blasingame acknowledged Ingram "has been deemed a sexually violent predator" and "has been assessed as an above average level of risk" for reoffense if released. He then stated, "The *presumption* of a court order allowing residential placement *is that the residential care staff will provide adequate supports and supervision to encapsulate* [*Ingram's*] *risk*." (Italics added.) In other words, in order to find Ingram met his burden of proving he

23

would not sexually reoffend if conditionally released, one has to presume that staff at whatever facility or home he is placed in will never let him out of their sight. Given that a primary purpose of the SVPA "is to protect the public from a select group of criminal offenders" (*Walker v. Superior Court, supra*, 12 Cal.5th at p. 184), the trial court was not required to make such a presumption.

As for Licciardello, at best her testimony shows there might be some type of home or facility located in a rural part of San Bernardino County that provides residential care to sex offenders. Other than her second-hand testimony, we have no information about this home, and we have no idea whether it could implement Dr. Blasingame's enhanced supervision recommendations (i.e., 24/7, one-on-one, arm's length supervision). Licciardello's testimony thus does not establish Ingram is unlikely to reoffend if conditionally released. Indeed, Licciardello did not offer any testimony on that issue.

### 2. Constitutional Challenges to the SVPA

Ingram also argues the SVPA's conditional release provisions are unconstitutional for two reasons. First, he argues: (1) he is entitled to treatment to reduce his risk of reoffending so he can be conditionally released; (2) in order to be "constitutionally adequate," such treatment must reasonably accommodate his intellectual disability; and (3) DSH has failed to provide treatment that reasonably accommodates his disability. Second, he argues the SVPA is unconstitutional because of excessive delays that exist in finding SVPs housing in the community after they have been found suitable for conditional release. As a result of these delays, SVPs can remain confined for years, and some may be effectively unreleasable due to a recent appellate court decision (*People v. Superior Court* (*Cheek*) (2023) 87 Cal.App.5th 373) that (according to Ingram) allows "anyone who lives within a quarter mile of the proposed release site [to] stop the release simply by purporting to open a home school." We agree with the People that these constitutional challenges are not properly before us.

First, Ingram did not raise these constitutional challenges below, and as a general rule, "issues not raised in the trial court cannot be raised for the first time on appeal." (*Wisner v. Dignity Health* (2022) 85 Cal.App.5th 35, 44; see also *Premier Medical Management Systems, Inc. v. California Ins. Guarantee Assn.* (2008) 163 Cal.App.4th 550, 564 [" ' " 'a reviewing court will ordinarily not consider claims made for the first time on appeal which could have been but were not presented to the trial court' " ' "].) Ingram argues we have discretion to consider new issues on appeal, and although this may be technically true, our discretion is not unlimited. "Although appellate courts have discretion to consider an issue in the first instance if it raises a question of law on undisputed facts, our Supreme Court has cautioned that such discretion should be exercised rarely and only in cases presenting an important legal issue." (*Wisner*, at p. 44.) Put another way, "An exception to the general rule may be presented . . . where the theory presented for the first time on appeal involves only a legal question determinable from facts which not only are uncontroverted in the record, but which could not be altered by the presentation of additional evidence." (*Redevelopment Agency v. City of Berkeley* (1978) 80 Cal.App.3d 158, 167.) Ingram's constitutional challenges do not raise pure legal issues that are determinable from incontrovertible and unalterable facts.

As to whether DSH failed to provide treatment that reasonably accommodated Ingram's intellectual disability, that presents a predominantly factual issue and the facts are both controverted and could be altered by the presentation of additional evidence (i.e., what disability was DSH aware of and when, what accommodations were needed, what accommodations were offered or made, how did Ingram respond, what other accommodations might be available, etc.). And as noted above, we also agree that a petition for conditional release is not the proper forum to litigate reasonable accommodation issues. As to the claim that conditional release is excessively delayed because of difficulties finding appropriate housing, that, too, raises a predominantly

factual issue rather than a legal issue, and the record contains *no evidence* about delays in finding housing, much less undisputed evidence.

Second, because the trial court denied his petition, Ingram lacks standing to challenge the SVPA on the ground that conditional release is excessively delayed because of difficulties finding housing. "One who seeks to raise a constitutional question must show that his rights are affected injuriously by the law which he attacks and that he is actually aggrieved by its operation." (*People v. Williams* (1966) 247 Cal.App.2d 169, 170.) " 'It is well-settled law that the courts will not give their consideration to questions as to the constitutionality of a statute unless such consideration is necessary to the determination of a real and vital controversy between the litigants in the particular case before it. It is incumbent upon a party to an action or proceeding who assails a law invoked in the course thereof to show that the provisions of the statute thus assailed are applicable to him and that he is injuriously affected thereby.' " (*People v. Bocklett* (2018) 22 Cal.App.5th 879, 898.) Because the trial court denied his petition, Ingram will not be injured by any excessive delays that may exist in finding and approving housing, and he thus lacks standing to challenge such delays.

## DISPOSITION

The judgment is affirmed.

/s/
EARL, P. J.

We concur:

/s/
ROBIE, J.

/s/
RENNER, J.

26