Filed 10/14/25  Hakob B. v. Tina S. CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| HAKOB B., | B339456 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. 20STFL03541) |
| v. | |
| TINA S., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Josh R. Freeman Stinn, Judge.  Affirmed.

Jones Day and David Phillips; Family Violence Appellate Project and Arati Vasan for Defendant and Appellant.

Kermisch & Paletz and Lauren M. Lookofsky for Plaintiff and Respondent.

This is an appeal from the trial court's denial of a request for renewal of a domestic violence restraining order (DVRO). The party who sought the restraining order, Tina S. (appellant),[1] invites this court to reweigh the evidence presented at the hearing and reverse the trial court's order. That is not the role of an appellate tribunal. We review the trial court's decision for abuse of discretion and affirm the order.

## FACTS AND PROCEDURAL BACKGROUND

### I. Renewal Hearing Testimony of Tina S.

#### A. *The DVRO*

In May 2020 Tina S. (Tina) filed a request for a DVRO, naming her husband Hakob B. (Hakob) as the person to be restrained. While there were numerous incidents alleged to support the restraining order, the testimony at the renewal motion highlighted those set forth below.

June 18, 2019. As Tina was preparing to depart the residence for her mother's home, Hakob told her that he wanted her to return within two hours. Tina encountered traffic on the way home and was delayed. She ultimately arrived after the two-hour deadline. Hakob was not home, but when he arrived, he was angry about Tina's tardiness and slapped her face.

July 3, 2019. Tina was nine months pregnant with their son (A.B.). During an argument, Hakob threatened to kill her.

---

1    We granted appellant's request to use pseudonyms "Tina S.," "Hakob B." (respondent), and "A.B." (the parties' minor child). (See Cal. Rules of Court, rule 8.90(b)(1).)

He commented, "Watch after [the] divorce what I am going to do to you." Video of the event was played for the trial court.

February 25, 2020. Tina locked herself in a bedroom because she believed a conversation she was having with Hakob had the potential of escalating into a violent argument. Hakob angrily banged on the door demanding that she open it. When Tina called her mother and placed her on the speakerphone, Hakob retreated downstairs. Tina left the bedroom because she heard their baby crying. She encountered Hakob who commented, "Why are you closing the door on me?" He grabbed her arm and slapped her face. A bruise appeared on her arm a day or two later.

March 20, 2020. Hakob compared "beautiful" women he was watching on television to Tina and called her a "fat bitch." This upset Tina; she grabbed her keys to leave the residence. Hakob blocked her path, put one of his hands on her neck, and pushed her against the wall. With the other hand, he grabbed her arm causing a bruise.[2]

---

[2] Other allegations of Hakob's abuse in Tina's declaration (but not mentioned in her testimony at the renewal hearing) included:

(1) slapping her face and twisting her arm in late 2016 or early 2017;

(2) slapping her face and pushing her onto the bed in August 2017;

(3) striking her with his elbow as Hakob drove his car and she was seated in the passenger seat in March 2018;

(4) striking her in the leg in September 2018;

(5) swinging her from side to side as she held her baby in either late September or early October 2019;

On October 13, 2020, the parties stipulated to the issuance of a restraining order for three years. The trial court filed an order consistent with the stipulation; its expiration was October 13, 2023. Tina was granted custody of A.B. with Hakob having visitation rights. Among the restrictions the order placed on Hakob were (1) he was not permitted to contact Tina except for the brief and peaceful contact necessary to facilitate visitation with A.B., and (2) he was prohibited from being within 100 yards of Tina.

## B. The Throat-Slitting Gesture

Tina alleged in her declaration supporting renewal that, during a July 2022 custody exchange, Hakob directed a throat-slitting gesture to Tina from his vehicle. This event was not referenced during her direct examination but, on cross-examination, counsel asked her several questions about it. She explained she did not have a video of the incident because it occurred at the conclusion of the exchange, when she reached the door to her residence and turned around to view Hakob's car. A police report was not filed, and Tina's lawyer did not send a letter to Hakob's counsel, or anyone else, regarding the incident.

---

(6) slapping her face and pushing her against a wall in September 2019;

(7) kicking her leg while she sat on the living room couch in December 2019

(8) placing his hand over her mouth and pinching her nose closed in March 2020; and

(9) throwing objects at her in November 2019 and March 2020.

4

### C. *Hakob's Civil Harassment Restraining Order*

Tina's father generally accompanied Tina for A.B.'s custody exchanges. After an exchange on August 29, 2022, as Tina and her father were walking away, Hakob commented, "Do you think your restraining order is finished? Well, think again." Hakob then sought a restraining order against Tina's father but, on October 12, 2022, the request was denied.

### D. *A.B.'s Injury*

In mid-January 2023, A.B. injured his knee during play time and was taken to the doctor by Tina. After the doctor visit, she used an application entitled "Our Family Wizard" (OFW) to send Hakob a written message explaining the doctor's assessment of A.B.'s knee. Hakob referenced the injury in a January 15, 2023 message that accused Tina of being a bad mother for neglecting to "keep [her] eye on [A.B.]." [3]

While A.B. was visiting with Hakob on January 16, 2023, it became apparent that the condition of A.B.'s knee was worsening, and Hakob opted to take A.B. to an urgent care facility. He contacted Tina about the problem and told her that he would be unable to meet the drop-off time of 6:00 p.m. A.B. was ultimately transferred from urgent care to a hospital emergency room.

On January 17, 2023, A.B. had surgery to remove bacteria that formed on his knee. Prior to the surgery, Tina used her mother's phone to speak with Hakob. He wanted to be present for the surgery and planned to be there even if it was contrary to

---

[3]     The doctor's notes reviewed by Tina indicated Hakob told the doctor that he reported Tina to the Department of Children and Family Services (DCFS). A January 16, 2023, DCFS letter (Ex. 19) reflected the case was closed.

her wishes. Because Tina considered the event to be "an emergency situation" she allowed him to be at the hospital but cautioned Hakob to stay far away from her. However, Tina spent several hours with Hakob alone with A.B. in the hospital room with the door slightly ajar. Tina and Hakob slept in A.B.'s room for three nights.

### E. The Request for Renewal is Filed

The request for renewal of the restraining order was filed on October 6, 2023. It sought renewal for life or, alternatively, for five years. Tina testified she was afraid of Hakob noting she had been subjected to his threats, abuse, and harassment. She referenced the July 3, 2019, pre-DVRO threat and expressed concern that, if the renewal was denied, Hakob's gun may be returned to him and he may use it to kill her.

In addition to the previously referenced January 15, 2023 message, Tina testified about a September 2021 OFW message in which Hakob indicated her "toxic behavior" is the reason why he had to divorce her. When Tina's counsel began to question her about another message, a discussion with opposing counsel and the trial court ensued regarding the need to have testimony regarding the messages since the messages were included in the exhibits. The trial court noted that it had read the communications and will re-read all the highlighted portions of the messages. Thus, Tina's counsel changed the direction of his direct examination and there was no further testimony about the OFW messages.

OFW contacts referenced in the written request for renewal but not during Tina's testimony included the following: (1) three October 2021 messages which, when read together, question her

6

mental health and suggest she is a bad mother who does not take A.B.'s health seriously; (2) a October 2022 message in which Hakob thanks God for not having to hear Tina's arguments; (3) a November 2022 message pointing out A.B.'s injuries while under Tina's care and questioning whether she believes it is necessary to keep A.B. safe; and (4) two March 2023 messages suggesting Tina needs "professional help."

Since filing of the request for renewal, Hakob has come within 100 yards of Tina on two occasions.

December 29, 2023. At approximately 5:00 p.m., when Tina was picking A.B. up from preschool, Hakob was present to pay the tuition and spoke to A.B. about a picture A.B. had drawn. Hakob was due to commence visitation at 6:00 p.m. and asked Tina if he could take him directly from the schoolyard. Tina agreed. Hakob then asked if he could keep A.B. an extra day to celebrate the new year. Tina again agreed. Hakob replied, with surprise, "Really?" He said, "Thank you. Can I give you a hug?" Tina did not allow Hakob to hug her.

March 28, 2024. Tina took A.B. to the hospital to have his appendix removed. Upon their arrival, she encountered Hakob. Tina told Hakob he could stay at the hospital as long as he is not near her and "doesn't deal with [her]." Nonetheless, although there were plenty of empty tables in the cafeteria, the two of them ate lunch together with other family members. A.B. spent six days in the hospital; Tina saw Hakob each day. There was no occasion where Hakob scared or threatened her. A photo was shown to the trial court that depicted Tina clapping and smiling as Hakob pretended to be the Easter bunny for A.B.

7

## II.  Renewal Hearing Testimony of Hakob B.

### A.  *Allegation of Throat-Slitting Gesture*

Hakob was asked about the portion of Tina's declaration wherein she alleged that, during a July 2022 custody exchange, Hakob directed a throat-slitting gesture to Tina from his vehicle. Hakob denied making such a gesture and offered that he had never made a threatening gesture when leaving a custody exchange.

### B.  *A.B.'s Surgeries*

In January 2023, during a visitation, A.B. was taken to an urgent care facility by Hakob. Tina met Hakob at the urgent care, just before A.B. was transferred to the emergency room. Tina did not go home that night and the two of them spent three straight days together at the hospital tending to A.B. At no point did Hakob harass or threaten Tina during the hospital stay, and he was never asked by Tina to leave the area.

With respect to the March 2024 surgery, Hakob was present at the hospital every day. He arrived in the morning and sometimes stayed as late as 11:00 p.m. On each of the six days A.B. was in the hospital, he spent several hours alone with Tina in the hospital room. When A.B. was in surgery, Hakob went to the cafeteria to purchase food. As he was walking with his lunch, Tina invited him to sit at her table noting there was an open chair, and he was "welcome to sit."

### C.  *The December 2023 Preschool Incident*

Hakob's encounter with Tina and A.B. was inadvertent as Hakob was present to pay the tuition. He had a "friendly [and] peaceful" conversation with Tina. Hakob was happy that Tina agreed to extend his visitation with A.B. and asked if he could

8

give her a hug "to show [his] respect toward[] her." When counsel asked Hakob if he intended to offend Tina, Hakob responded, "Of course not."

### D.     Prior Threats/Abuse

Hakob acknowledged pre-DVRO abuse of Tina and the threat to kill her depicted on a video. He believed his actions were inappropriate and were legitimate grounds for the DVRO. Following the issuance of the DVRO, he completed anger management classes and a "batterers intervention" program. Each curriculum was 52 weeks long, meaning he completed 104 weeks of classes. Hakob was amenable to a court order prohibiting him from possessing a firearm "pending further court order" in the event the DVRO was not renewed.

### E.     Hakob's Professional/Personal Life

Hakob is an engineer at two different United States Air Force bases. He is employed by the Defense Department with a "very high classified clearance." Although he has been eligible for promotions, those opportunities were blocked by the existence of the DVRO. At the time of his testimony, he was in a dating relationship with a woman.

## III.    The Trial Court's Decision

The trial court filed a five-page written decision. It acknowledged the seriousness of the incidents supporting the DVRO but found that "compelling and persuasive evidence was presented at the [renewal] hearing that raised substantial doubt regarding [Tina's] continued apprehension of future abuse by [Hakob]." The trial court pointed to A.B.'s hospital stays noting

9

that Tina allowed Hakob to keep her company in A.B.'s hospital room and, in January 2023, she had several overnight stays with Hakob in A.B.'s room. It characterized Hakob's presence as "discretionary" on Tina's part writing that "there may well have been workable alternatives that would have enabled [Hakob's] presence without necessarily being in the direct and protracted presence of [Tina]."

The trial court also relied on the interaction between Hakob and Tina at the preschool wherein Tina appeared unphased by Hakob's presence and agreed, not only to an early custody exchange, but also an extra day of visitation. It characterized Hakob as "overjoyed" by Tina's concession and put some weight on Hakob's conduct after his request for a hug was denied, i.e., he did not "push[] that request any further."

In assessing Tina's fear of Hakob, the trial wrote, "considered in the aggregate and over the course of more than a year between events (e.g., the 2023 and 2024 hospitalizations), given [Tina] could have but did not insist on [Hakob's] adherence to the [DVRO], this court is persuaded [Tina's] apprehension/fear, while perhaps still present, is not objectively reasonable . . . ."

## DISCUSSION

### *Standard of Review*

A trial court's order denying a request for renewal of a DVRO is reviewed for abuse of discretion. (*Navarro v. Cervera* (2025) 108 Cal.App.5th 229, 238.) If it is necessary to review factual findings, we refrain from reweighing evidence and consider whether the findings are supported by substantial evidence. (*In re Harris* (2024) 16 Cal.5th 292, 319 [reviewing

court prohibited from reweighing facts in assessing whether substantial evidence exists]; *Navarro v. Cervera*, *supra*, 108 Cal.App.5th at p. 238 [factual findings in DVRO renewal reviewed for substantial evidence]; *M.S. v. A.S.* (2022) 76 Cal.App.5th 1139, 1145 [reviewing court declines to reweigh evidence in determining propriety of DVRO].)

"'A court abuses its discretion if it acts "in an arbitrary, capricious, or patently absurd manner"' [citation] or 'when its ruling "falls outside the bounds of reason"' [citation]." (*People v. Thomas* (2023) 14 Cal.5th 327, 399.) The California Supreme Court has emphasized: ""The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court."' [Citations.]" (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318–319.) Nevertheless, "[i]f the court's decision to deny a renewal request is influenced by an erroneous understanding of the law, the court has not properly exercised its discretion under the law. [Citations.]" (*Michael M. v Robin J.* (2023) 92 Cal.App.5th 170, 178 (*Michael M*).)

### *The Renewal Order*

A protected party may apply for renewal of a DVRO "for five or more years, or permanently, at the discretion of the court." (Fam. Code, § 6345, subd. (a).) To warrant renewal, the protected party must demonstrate "a reasonable person, in petitioner's circumstances, would fear repetition of the abuse if the order expired." (*G.G. v. G.S.* (2024) 102 Cal.App.5th 413, 421.) There must be a showing that ""it is more probable than not there is a sufficient risk of future abuse to find the protected party's

11

apprehension genuine and reasonable.'" [Citation.]" (*Navarro v. Cervera, supra,* 108 Cal.App.5th at p. 238.)

In its evaluation of whether the protected party's fear of future abuse is reasonable, the trial court is to consider the "'findings and facts'" related to the DVRO as well as "'any significant changes in the circumstances surrounding the events justifying the initial protective order.'" (*Michael M., supra,* 92 Cal.App.5th at p. 180, quoting *Ritchie v. Konrad* (2004) 115 Cal.App.4th 1275, 1290–1291 (*Ritchie*).) "'Also relevant are the seriousness and degree of risk, such as whether it involves potential physical abuse, and the burdens the protective order imposes on the restrained person such as interference with job opportunities.' [Citation.]" (*Michael M., supra,* 92 Cal.App.5th at p. 180; see also *Ritchie, supra,* 115 Cal.App.4th at p. 1291.)

The trial court was aware of the requirements for renewal. It quoted the reasonable person test, relied on *Ritchie,* and recounted the appropriate factors for consideration. The trial court was not influenced by an erroneous understanding of the law. (See *Michael M., supra,* 92 Cal.App.5th at p. 178.) We turn to the relevant considerations.[4]

Although the record includes a minute order indicating a previous judge issued the DVRO after a hearing, the parties

---

[4] Although there was evidence regarding the burden the restraining order placed on Hakob's professional development, the trial court did not specifically balance the burden versus risk factor. However, by finding the apprehension that future abuse would occur was not reasonable, it necessarily concluded the "degree of risk" was minimal.

agree that they stipulated to the restraining order without a hearing. Thus, the record does not reflect any factual findings made by the trial court with respect to Tina's allegations supporting the DVRO. Having said that, Tina's DVRO declaration was attached as an exhibit to the request for renewal. There is no question the trial court considered the allegations set forth therein as its order specifies it reviewed the written request for renewal (as well as the opposition) and states, "[Tina's] allegations of abuse supporting the issuance of her underlying [DVRO] were very serious. The alleged abuse was physical, verbal, and included death threats." Indeed, the court recognized Tina "*was* most certainly and justifiably terribly afraid of [Hakob] given his egregious and abusive conduct," but that "compelling and persuasive evidence was presented at the [renewal] hearing . . . raised substantial doubt regarding [Tina's] *continued* apprehension of future abuse by Hakob." (Italics added.)

The next question for the trial court was whether there had been a change in factual circumstances. It recognized, since the issuance of the DVRO, Hakob had completed two therapy programs and neither party sought to litigate violations of the DVRO nor did they request a modification of the restraining order or custody arrangement. The trial court reasonably relied on Tina's conduct during A.B.'s two hospital stints as it suggested, at least from an objective perspective, Tina's attitude toward the restraining order had evolved. Indeed, the record reflects Tina accepted Hakob's presence in the hospital rooms alone with her (and A.B.), even spending several nights together. As the trial court pointed out, Tina (or a reasonable person in her circumstances) could have asked Hakob to be present in shifts

13

with her in order to avoid exposure to abuse.[5]  But Tina elected to not require Hakob's adherence to the protective order and even invited him to sit at her cafeteria table with his lunch.[6]

As the court recognized, the preschool exchange was also meaningful.  Tina could have told Hakob that he was improperly near her before the scheduled visitation.  However, she elected to

---

[5]      "Abuse" is broadly defined to include, among other things, any behavior that could be enjoined pursuant to Family Code section 6320, e.g., harassment or disturbing the peace of another. (Fam. Code, §§ 6203, subd. (a)(4), 6320, subd. (a).)

[6]      Tina's testimony regarding the circumstances surrounding the cafeteria lunch was different from Hakob's account of the incident.   In addition, Tina's declaration regarding the January 2023 hospital visit includes allegations (not mentioned in her testimony) of Hakob (a) squeezing her arm as she cried while A.B. was being wheeled into surgery, and (b) denying her request to move away from her.  It is unclear from the record whether the claim that Tina's arm was grabbed concerns an attempt by Hakob to console Tina or an act of aggression.  Hakob's testimony makes no reference to grabbing Tina's arm (nor was he confronted with that allegation on cross-examination) and, the allegation was somewhat contradicted by his testimony that he did not harass her at the hospital and she never asked him to leave.  To the extent the evidence is at odds on these points, we make the following observation.  "'Consistent with well-established principles governing review for sufficiency of the evidence, in making this assessment [we] must view the record in the light most favorable to the prevailing party below and give due deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence.' [Citation.]" (*Hansen v. Volkov* (2023) 96 Cal.App.5th 94, 104.)

not only permit the close proximity but also extend Hakob's visitation time. Tina's denial of a hug resulted in no hostility, and the court could reasonably conclude, from an objective perspective, this was an affable encounter devoid of any degree of fear.

Tina's approach to challenging the trial court's thought process can be divided into three parts. The initial claim is the trial court discounted Tina's subjective fear and had an improper "fixation" on what Tina should have done rather than on Hakob's abuse and admitted violations of the DVRO. Second, the trial court failed to recognize that each contact following the DVRO was a violation of that order. Third, the trial court erred by requiring Tina to provide corroborating evidence of her allegation that Hakob made a throat-slitting gesture while looking at her.

We do not read the trial court's order as a fixation on what Tina should have done. Rather, the trial court repeatedly referenced its duty to determine whether Tina's fear of future abuse was objectively reasonable with primary consideration given to the seriousness of the allegations supporting the DVRO, the number of occasions that Tina permitted Hakob to be in close proximity to her since the issuance of the DVRO, the nature of their contacts, and Hakob's completion of extensive therapy.[7]

---

[7] Tina expresses concern that the trial court "required abuse survivors to pursue formal enforcement at the risk of forfeiting their ability to seek renewal of a DVRO." It is true that the trial court noted "[no] contempt actions [were] filed alleging violations of the [DVRO]." But in no sense did it *require* a party seeking renewal of a DVRO to have filed contempt actions associated with alleged violations in order to secure a renewal. Rather, the trial

With respect to the OFW messages, it is clear the court considered them, but it did not make any explicit finding on whether they constituted a violation of the DVRO. What it did do was to recognize they were "inappropriate and misguided" but minimized their significance to its ruling "given the parties' back and forth with each other."[8] Hakob's statement to Tina and her father while they walked away from the August 29, 2022 custody exchange is similarly situated; the trial court found it "questionable" whether it violated the DVRO or constituted a threat and, apparently for that reason, determined it was not entitled to significant weight; indeed, the comment lacked clarity. In sum, given Tina's permissive interactions with Hakob and his completion of two therapy programs, the trial court reasonably concluded the contacts/comments were not adequate to establish a reasonable apprehension of abuse. It is not our role to rebalance the evidence presented and reach a different result. (*M.S. v. A.S.*, *supra*, 76 Cal.App.5th at p. 1145.)

court's comment constituted an observation that had some bearing on whether a reasonable person would fear repetition of the abuse if the order expired. It stands to reason that, from an objective standpoint, a protected party who files contempt actions alleging violations of a DVRO may, depending on the circumstances, harbor a more reasonable fear of future abuse than a protected party who acquiesces to said violations.

[8] Many of the messages involved a back-and-forth conversation regarding the treatment of, and visitation with, A.B. For example, the January 15, 2023 exchange began with a message from Tina inquiring about the condition of A.B.'s knee and included commentary about how to care for the injury.

Tina's argument that the court improperly required corroboration of the throat-slitting gesture lacks merit. The only evidence supporting the incident was Tina's declaration and her testimony on cross-examination that she was unable to videotape the incident. Hakob denied making such a gesture. It is true that "the testimony of one witness, if believed, may be sufficient for the proof of any fact. (Evid. Code, § 411)." (*People v. Rasmuson* (2006) 145 Cal.App.4th 1487, 1508, italics added.) In this respect, the trial court wrote, "Apart from [Tina's] allegation, no proof was presented that [Hakob] did that," i.e., gestured as if he were slitting his throat. In other words, the trial court found Tina was not credible on this point (and/or Hakob was credible); a determination that we are not at liberty to disturb (*Sabbah v. Sabbah* (2007) 151 Cal.App.4th 818, 823). Contrary to Tina's claim, the trial court imposed no requirement that those seeking a DVRO corroborate their allegations.

### *Conclusion*

By and large, Tina's arguments for reversal of the order require a rebalancing and/or reassessment of the facts presented to the trial court. We are precluded from taking such an approach. (*M.S. v. A.S.*, *supra*, 76 Cal.App.5th at p. 1145.) Having identified substantial evidence to support the trial court's findings underlying its determination that there was no reasonable apprehension of future abuse, "it is of no consequence" that other evidence or inferences drawn from the evidence might have supported a contrary ruling. (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 874, italics omitted.) Similarly, in assessing whether the trial court's decision exceeded the bounds of reason, we adhere to the rule that, although two or more inferences can be deduced from the facts, the reviewing court has no authority to

substitute its decision for that of the trial court.  (*In re Stephanie M., supra*, 7 Cal.4th at p. 318–319.)  Tina has not demonstrated the trial court's decision was arbitrary, capricious or exceeded the bounds of reason.  There was no abuse of discretion.

## DISPOSITION

The order denying renewal of the domestic violence restraining order is affirmed.  Hakob is to recover costs on appeal.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


KUMAR, J.*

I Concur:


MOOR, Acting P. J.

---

*     Judge of the Los Angeles Superior Court (retired), assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Hakob B. v. Tina S.
B339456


KIM (D.), J., Concurring


I concur in the result but write separately to emphasize that my concurrence is based on the well-established standards governing our review. If I were deciding this matter de novo, I would not necessarily draw some of the same inferences from specific instances of Tina's conduct. For instance, I would not conclude that Tina's conduct toward Hakob during the hospital stays "suggested" that Tina's attitude toward the restraining order had changed. Nor would I find that Tina's denial of Hakob's request for a hug demonstrated that their interaction was "affable." But I need not make these individual findings because, as the majority notes, we do not reweigh the evidence on appeal but instead determine whether substantial evidence supports the trial court's findings (including its implied findings) and, consequently, its ultimate finding that a reasonable person, in Tina's circumstances, would not fear repetition of the abuse if the order expired. On this record, I agree that sufficient evidence supported that finding and that the court therefore did not abuse its discretion.


KIM (D.), J.